

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-13-1995

# North River v Cigna Reinsurance Co.

Precedential or Non-Precedential:

Docket 93-5743

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"North River v Cigna Reinsurance Co." (1995). *1995 Decisions.* Paper 91.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/91

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Nos. 93-5743 & 93-5764
_____


NORTH RIVER INSURANCE COMPANY

v.

CIGNA REINSURANCE COMPANY, individually
and as successor to INA REINSURANCE COMPANY

                          North River Insurance Company,
                               Appellant in No. 93-5743

                          CIGNA Reinsurance Company,
                               Appellant in No. 93-5764


_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 91-cv-01323)
_____


Argued July 21, 1994

Before:  SCIRICA, LEWIS and SEITZ, Circuit Judges

(Filed April 13, 1995)


BARRY R. OSTRAGER, ESQUIRE (ARGUED)
MARY K. VYSKOCIL, ESQUIRE
JOSEPH F. WAYLAND, ESQUIRE
Simpson, Thacher & Bartlett
425 Lexington Avenue
New York, New York 10017

   Attorneys for Appellant/Cross-Appellee,
   North River Insurance Company

THOMAS A. ALLEN, ESQUIRE (ARGUED)
ELLEN K. BURROWS, ESQUIRE
WILLIAM E. COX, ESQUIRE
MARION R. HUBING, ESQUIRE
White & Williams
One Liberty Place
1650 Market Street, Suite 1800
Philadelphia, Pennsylvania 19103

   Attorneys for Appellee/Cross-Appellant,
   CIGNA Reinsurance Company, individually
   and as successor to INA Reinsurance Company


MITCHELL F. DOLIN, ESQUIRE
Covington & Burling
1201 Pennsylvania Avenue, N.W.
P.O. Box 7566
Washington, D.C. 20044

   Attorney for Amicus Curiae Appellants,
   Armstrong World Industries, Inc.,
   Asbestos Claims Management Corporation,
   CertainTeed Corporation, C.E. Thurston & Sons, Inc.,
   Dana Corporation, Ferodo America, Inc., Flexitallic, Inc.,
   GAF Corporation, National Service Industries, Inc.,
   Pfizer Inc., Shook & Fletcher Insulation Company,
   T&N PLC and United States Gypsum Company


DAVID M. RAIM, ESQUIRE
Chadbourne & Parke
1101 Vermont Avenue, N.W.
Suite 900
Washington, D.C. 20005

   Attorney for Amicus Curiae Appellant/Cross-Appellee,
   The Aetna Casualty & Surety Company


MARK D. LEBOW, ESQUIRE
Coudert Brothers
1114 Avenue of the Americas
New York, New York 10036

   Attorney for Amicus Curiae Appellants/Cross-Appellees,
   The Continental Insurance Company,
   Royal Insurance Company and
   The Travelers Insurance Company

WILLIAM J. BOWMAN, ESQUIRE
Hogan & Hartson
555 13th Street, N.W.
Washington, D.C. 20004-1109

   Attorney for Amicus Curiae Appellant/Cross-Appellee,
   ITT Hartford Insurance Group


JOSEPH J. SCHIAVONE, ESQUIRE
Budd, Larner, Gross, Rosenbaum, Greenberg & Sade
150 John F. Kennedy Parkway
CN 1000
Short Hills, New Jersey 07078-0999

   Attorney for Amicus Curiae Appellee/Cross-Appellant
   Reinsurance Association of America

——————————————

OPINION OF THE COURT

——————————————


SCIRICA, Circuit Judge.

       This is a dispute between an excess insurer and a
reinsurer over who should pay for defense litigation costs
arising out of asbestos injury claims against the underlying
insured. Under procedures established by the Wellington
Agreement, a comprehensive agreement between asbestos producers
and insurers designed to resolve disputes over coverage,[1] an

---

[1]. The Wellington Agreement represented an innovative effort by
asbestos producers and their insurers to solve the asbestos
litigation crisis. The Agreement established a non-profit claims
handling center that coordinated claim payments on behalf of
producers. It also contained provisions that aimed to avoid
coverage disputes between producers and their insurers and
established arbitration procedures to adjudicate claims the
participants could not settle. For a detailed discussion of the
Wellington Agreement, see discussion infra at part II.

arbitrator ruled that North River Insurance Company was obligated to pay defense costs, in excess of policy limits, to its insured, Owens-Corning Fiberglas Corporation, an asbestos manufacturer. North River then sought indemnification from its reinsurer, CIGNA Reinsurance Company, for the defense costs it paid to Owens-Corning.[2]

In these cross appeals we must decide whether four facultative reinsurance certificates issued by CIGNA Re to North River obligate CIGNA Re to indemnify North River for defense costs. We also must decide whether actions taken by North River in connection with its participation in the Wellington Agreement violated its duty of good faith, and whether the district court erred by refusing to reconsider its judgment to include, as an alternative basis for summary judgment, that a reinsurance certificate's indemnity limit caps the amount a reinsurer is obligated to pay under the policy.

The district court granted summary judgment to CIGNA Re, holding defense costs were not covered under the reinsurance certificates and North River violated its duty of good faith. North River Ins. Co. v. Philadelphia Reinsurance Corp., 831 F. Supp. 1132, 1153 (D.N.J. 1993). The district court denied summary judgment to North River finding factual disputes

---

[2]. CIGNA Re has paid more than $30 million in indemnity payments under the several reinsurance certificates it issued to North River. On the four facultative reinsurance certificates at issue here, North River contends CIGNA Re owes approximately $13 million plus interest in defense costs. North River Ins. Co. v. Philadelphia Reinsurance Corp., 831 F. Supp. 1132, 1136-37 (D.N.J. 1993).

involving North River's rejection of a settlement with Owens–Corning and North River's notice to CIGNA Re about the arbitration proceeding. Id. at 1147–48, 1153.

We believe the coverage of defense costs was reasonably within the terms of the North River–Owens–Corning insurance policies as reinsured. We also believe the district court erred in holding that North River breached its duty of good faith to its reinsurer. We find, as a matter of law, that CIGNA Re cannot show that North River's decision to enter the Wellington Agreement violated its duty of good faith. But we find disputed issues of material fact exist on the questions of North River's good faith in failing to schedule its policies under Wellington and its rejection of the settlement proposal.

Accordingly, we will reverse the district court's grant of summary judgment to CIGNA Re and reverse the denial of summary judgment to North River on all points except the question of bad faith relating to North River's failure to schedule and its rejection of the settlement proposal. On remand, consideration of the question of bad faith shall be limited to asking (1) whether CIGNA Re has established that North River breached its duty of good faith in failing to schedule its policies, and (2) if the disputed evidence relating to North River's rejection of the settlement proposal manifests a breach of North River's duty of good faith to its reinsurer. We also hold the district court properly denied the motion for reconsideration because CIGNA Re failed to raise the indemnity cap defense in the course of the proceedings below and because Unigard Security Insurance Co. v.

North River Insurance Co., 4 F.3d 1049 (2d Cir. 1993) ("Unigard III"),[3] did not change existing law.

## I.

Before we discuss the parties' contentions, some background is useful. Primary insurers, excess insurers, and reinsurers play different roles in the insurance industry. Both primary and excess insurers provide coverage directly to the insured policy holder. Primary insurance policies describe what kinds of liability will be covered and specify dollar limits. Excess insurers typically track the coverage offered by the primary insurer and also specify dollar limits, but the excess insurer's liability is not triggered until the primary insurer's limit is exhausted. Reinsurers do not provide coverage directly to the insured but issue certificates of reinsurance to the excess or primary insurer, also specifying dollar limits.

---

[3]. The district court referred to the Second Circuit's opinion as "Unigard II." We will call it "Unigard III," however, because it is the third published opinion concerning the same matter. Initially, Unigard, the reinsurer, brought an action in the District Court for the Southern District of New York, seeking a declaratory judgment relieving it of any obligation to indemnify the reinsured excess insurer, North River. Unigard Sec. Ins. Co. v. North River Ins. Co., 762 F. Supp. 566 (S.D.N.Y. 1991) ("Unigard I"), aff'd in part, rev'd in part, 4 F.3d 1049 (2d Cir. 1993). After judgment for North River, Unigard appealed to the Court of Appeals for the Second Circuit. That court certified a question to the Court of Appeals of New York, which held that a reinsurer must demonstrate prejudice and may not rely on a presumption of prejudice to prevail on a late loss notice defense. Unigard Sec. Ins. Co. v. North River Ins. Co., 594 N.E.2d 571, 575 (N.Y. 1992) ("Unigard II"). The Second Circuit affirmed in part and reversed in part the decision of the district court. Unigard Sec. Ins. Co. v. North River Ins. Co., 4 F.3d 1049, 1071 (2d Cir. 1993) ("Unigard III").

Reinsurance is purchased by insurance companies to insure their liability under policies written to their insureds. See Henry T. Kramer, The Nature of Reinsurance, in Reinsurance 1, 5 (R.W. Strain ed., 1980). Typically, an insurer who has provided coverage against a large loss will cede all or part of that risk to other insurance companies along with a portion of the premiums. Ceding risk increases the insurer's capacity to insure other customers and decreases the likelihood that insurer insolvency will result from any large claim.[4]

There are two types of reinsurance contract: treaty and facultative. Under a reinsurance treaty, the reinsurer agrees to accept an entire block of business from the reinsured. William G. Clark, Facultative Reinsurance: Reinsuring Individual Policies, in Reinsurance, supra, at 117, 121. Once a treaty is written, a reinsurer is bound to accept all of the policies under the block of business, including those as yet unwritten. Because a treaty reinsurer accepts an entire block of business, it does not assess the individual risks being reinsured; rather, it evaluates the overall risk pool. Id.

---

[4]. Reinsured risk is spread in layers with premium dollars allocated in greater amounts to those who have taken larger risks. For example, an excess insurer who writes a $100 million policy might retain a certain portion of the risk, e.g., the first $10 million of excess liability, and reinsure the balance with other insurance companies. If no claim exceeds the $10 million retained liability, the original insurer will pay the entire excess claim. If, on the other hand, a claim is made that exceeds $10 million, that portion of the claim exceeding $10 million will fall on the reinsurer who has accepted the next layer of liability. As layers of coverage are exhausted, the loss falls on successive reinsurers until the claim is satisfied.

Facultative reinsurance entails the ceding of a particular risk or policy.  Unlike a treaty reinsurer who must accept all covered business, the facultative reinsurer assesses the unique characteristics of each policy to determine whether to reinsure the risk, and at what price.  Thus, a facultative reinsurer "retains the faculty, or option, to accept or reject any risk."  Id.; see also Francis M. Gregory, Jr. & Nicholas T. Christakos, Primary, Excess and Reinsurance Problems in Large Loss Cases, 59 Def. Couns. J. 540, 543 (1992) ("[T]he distinguishing characteristic is always the reinsurer's right of individual risk rejection.").

The reinsurance relationship depends on the reinsurer and the reinsured observing high levels of good faith.  See Unigard III, 4 F.3d at 1069.  The reinsured must keep its interests aligned with those of the reinsurer, see id., and the reinsurer must "follow the fortunes" of the reinsured, see Kramer, supra, at 12-13.

Reinsurance certificates usually employ standard forms.  A reinsurance certificate typically includes a "following forms" provision that expressly limits the reinsurance to the terms and conditions of the underlying policy and provides that the reinsurance certificate will cover only the kinds of liability covered in the original policy issued to the insured.  The reinsurance certificate often, as here, also includes a "follow the fortunes" clause, which is somewhat broader than the "following forms" clause and obligates the reinsurer to indemnify the reinsured for any good faith payment of an insured loss.

"Follow the fortunes" clauses prevent reinsurers from second guessing good-faith settlements and obtaining de novo review of judgments of the reinsured's liability to its insured. See International Surplus Lines Ins. Co. v. Certain Underwriters & Underwriting Syndicates at Lloyd's of London, 868 F. Supp. 917, 921 (S.D. Ohio 1994) ("Were the Court to conduct a de novo review of [the reinsured's] decision-making process, the foundation of the cedent-reinsurer relationship would be forever damaged."). But while a "follow the fortunes" clause limits a reinsurer's defenses, it does not make a reinsurer liable for risks beyond what was agreed upon in the reinsurance certificate. See Bellefonte Reinsurance Co. v. Aetna Casualty & Sur. Co., 903 F.2d 910, 914 (2d Cir. 1990); see also Kramer, supra, at 13 ("[T]he concept of follow fortunes cannot create a reinsurance where none exists."). In that regard, the reinsurer retains the right to question whether the reinsured's liability stems from an unreinsured loss. A loss would be unreinsured if it was not contemplated by the original insurance policy or if it was expressly excluded by terms of the certificate of reinsurance.

A.

North River Insurance Company sells excess insurance.[5] Between 1974 and 1978 it sold policies to Owens-Corning Fiberglas, an asbestos manufacturer. The excess insurance policies at issue here provided coverage for various amounts of loss in excess of $26 million. Under those policies North River insured Owens-Corning against "ultimate net loss," which generally excluded "costs." Elsewhere, however, the policies referred to North River's obligation to pay ultimate net loss and costs and described various ways that costs incurred with the written consent of North River would be apportioned. The policies did not include a duty to defend clause, but gave North River the option to participate in "the control, defense and/or trial of any claims, suits or proceedings."

North River reinsured a portion of this risk with various reinsurers including CIGNA Reinsurance, which issued North River four facultative reinsurance certificates each containing "following forms" language, a "follow the fortunes" clause, and a consent clause requiring North River to obtain CIGNA Re's prior approval for any changes made to the policies.

_____

[5]. North River is wholly owned by Crum & Forster Insurance Companies, Inc., which uses North River and other subsidiaries as issuing companies. "In 1983, Crum & Forster created a unit . . . to coordinate and control, but not to manage, environmental and asbestos claims for all of Crum & Forster's insurance affiliates." Unigard III, 4 F.3d, at 1057. Accordingly, although North River is the named party in this dispute, some of the relevant acts attributed to North River actually were undertaken by Crum & Forster. For example, it was Crum & Forster that signed the Wellington Agreement. References in this opinion to North River and to Crum & Forster refer to the same entity.

The reinsurance certificates did not expressly exclude coverage for defense costs.

Like all asbestos producers, Owens-Corning incurred high costs defending -- and paying out -- asbestos injury claims. By March, 1987, it had exhausted its primary insurance and sought coverage from its excess insurer, North River. But North River claimed that under the terms of the policies issued to Owens-Corning it was not obligated to cover defense costs. Because North River and Owens-Corning had signed onto the Wellington Agreement, a global settlement agreement providing for arbitration of asbestos coverage disputes, the dispute went to binding arbitration. The arbitrator found that under the terms of the policy itself, and according to the provisions of the Wellington Agreement, North River was obligated to cover Owens-Corning's defense costs.[6] After CIGNA Re refused to cover its share of these defense costs, North River filed suit in federal district court seeking to compel its reinsurer to "follow" North River's fortunes. As we have noted, the district court granted summary judgment to the reinsurer, CIGNA Re.

II.

The Wellington Agreement figures prominently in this dispute and merits some discussion. By the early 1980s, tens of thousands of asbestos injury claims had been filed against asbestos producers who were represented by more than a thousand

---

[6]. Under its policies North River has paid Owens-Corning more than $300 million in liability coverage and more than $250 million in defense costs. North River, 831 F. Supp. at 1135.

law firms nationwide.  See Lawrence Fitzpatrick, The Center for Claims Resolution, 53 Law & Contemp. Probs. 13, 14 (1990).  By 1985, manufacturers and their insurers had paid out an estimated one billion dollars on asbestos injury claims -- with roughly half going for costs alone.  Unigard III, 4 F.3d at 1055.  Meanwhile, there was a growing backlog of unresolved claims.  Id. Asbestos producers, insurance carriers, and courts tried to craft solutions to meet this crisis.

In 1985, several insurers and asbestos producers entered into the Agreement Concerning Asbestos Related Claims. Known as the Wellington Agreement because of the mediation of then-Yale Law School Dean Harry Wellington, the Agreement established the Asbestos Claims Facility, a non-profit claims handling center that coordinated claim payments on behalf of the asbestos producers.  The signatories to the Agreement sought to reduce asbestos litigation awards while lowering the associated costs.  The Agreement encouraged settlements in place of costly litigation and established arbitration procedures to adjudicate claims that producers and their insurers could not settle.  North River's parent, Crum & Forster, and Owens-Corning signed on. CIGNA Re, North River's reinsurer, did not.[7]

Wellington did not rewrite existing policies between producers and their insurers.  Rather, the Agreement aimed to avoid coverage disputes by applying insurance arrangements "in a

_____

[7].  In 1985, CIGNA Re was INA Reinsurance.  See infra note 27. INA Re's corporate parent, INA, was a signatory.

consistent manner." Wellington Agreement at 1. In several places, the Agreement established default coverage provisions to cover disputes but with the caveat "unless [the policy] expressly provides otherwise." See id. § XI, ¶¶ 1, 3, § XV, ¶ 5, and § XVIII, ¶ 1. Similarly, in Appendix D, Wellington required the signatory insurers and policy holders to "schedule" their policies to clarify particular features of coverage. Appendix D did not require insurers to provide coverage for defense costs; in fact, parties could agree to schedule their policies expressly to exclude defense costs. In the absence of any designation, however, Wellington set up a presumption that defense costs would be covered.

Appendix D set out nine "schedules" or generic categories of coverage: A through I. The insurer and the insured were supposed to agree on which category applied to their policy. For our purposes, the significant differences lie among categories "G," paying defense costs or "allocated expenses" beyond policy limits, "H," paying allocated expenses within the policy limits, and "I," not paying allocated expenses at all. But Appendix D also provided for a sanction if the insurer did not schedule the policy. By failing to schedule, the insurer was deemed to have assented to the policy-holder's designation.

A.

Crum & Forster and Owens-Corning signed the Wellington Agreement on June 19, 1985. In accordance with the requirements of Appendix D, each party was to execute a scheduling form for every policy subject to the Agreement. Owens-Corning submitted

the required form, scheduling its policies with North River as "G," which provided coverage for allocated expenses in addition to policy limits. North River did not agree to Owens-Corning's scheduling, but did not register its disagreement on the scheduling form. Instead of executing the required forms, North River, through Crum & Forster, wrote letters to Owens-Corning detailing what it did and did not agree to cover. North River contended that its correspondence constituted a proper challenge to Owens-Corning's scheduling because a separate provision of the Wellington Agreement, Appendix B, permitted subscribing insurers to reserve the right to raise defenses of exclusions of defense obligations or payments.

On March 13, 1987, the Asbestos Claims Facility notified North River that insured claims had exhausted the coverage on Owens-Corning's primary insurers' policies. Shortly thereafter, North River began receiving bills from Owens-Corning seeking indemnification for liability and reimbursement of defense costs. North River paid the liability claims but denied coverage for defense costs.

In accordance with Wellington's procedures, Owens-Corning and North River submitted their dispute to arbitration. They went first to non-binding arbitration, where Owens-Corning argued: (1) North River waived its rights to contest the policy scheduling, (2) North River acted in bad faith by failing to pay defense costs, and (3) the policies, as amended by Wellington, required North River to pay defense costs. The arbitrator believed that, if litigated, North River could prevail against

Owens-Corning's waiver and bad faith claims, but would have difficulty with the argument that the policy required payment of defense costs. Therefore, he proposed a settlement under which the policies would be rescheduled as "H" -- "the insurance policy pays allocated expenses and such expenses apply against aggregate limits."

When Owens-Corning and North River rejected the proposed settlement, the matter went to binding arbitration. On July 26, 1989, after a six-day proceeding, the arbitrator, retired United States District Court Judge H. David Hermansdorfer, ruled that North River was liable for Owens-Corning's defense costs. The arbitrator first examined North River's failure to comply with the scheduling requirement. He found that, under Wellington, insurers could properly challenge a policy holder's proposed schedule, but the challenge had to follow Wellington procedures, particularly the Appendix D scheduling requirement. Judge Hermansdorfer held that the letter response failed to satisfy Wellington's scheduling requirements. Because of its failure to use Wellington's Appendix D schedule to assert its challenge, North River was deemed to have assented to Owens-Corning's "G" designation. The arbitrator also relied on Wellington's presumption that, unless expressly excluded, all policies provided coverage for allocated costs.

But the arbitrator also examined the policy language, and found North River liable for defense costs on that basis as well. He noted that the policy language did not expressly exclude payment of defense costs and found the policy provided

for payment of costs upon consent of the insurer. Relying on case law and expert testimony about industry custom, the arbitrator found that policy language conditioning an insurer's duty to pay defense costs on receipt of its prior consent actually meant such consent could not be withheld unreasonably. According to the arbitrator, the policy relieved North River of the obligation to pay unreasonable expenses only. The arbitrator rejected North River's arguments that policy provisions relieving North River of the duty to assume charge of the settlement or defense of any claims against Owens-Corning relieved the insurer of the obligation to pay defense costs. He held North River responsible for Owens-Corning's defense costs because it had not met its burden of showing that those costs were excluded from the policy coverage.[8]

In September and in December, 1988, North River solicited "any views its reinsurers may have with respect to" the pending arbitration. App. at 1268-69, 1402-03. CIGNA Re did not respond to these requests. The arbitrator issued his opinion July 26, 1989, and North River, through Crum & Forster, promptly notified its reinsurers of the unfavorable arbitration decision. North River initially appealed the arbitrator's ruling but later dropped the appeal.

B.

---

[8]. See infra part III.B. for discussion of the arbitrator's reasoning.

CIGNA Re indemnified North River for liability under the policies but denied coverage for defense costs. North River then filed this suit seeking reimbursement for defense costs and a declaratory judgment that CIGNA Re must reimburse North River for future costs.

After discovery, the parties made cross-motions for summary judgment. North River claimed the reinsurance certificates obligated CIGNA Re to indemnify it for defense costs, while CIGNA Re maintained defense costs were an unreinsured risk. In a comprehensive opinion, the district court granted summary judgment to CIGNA Re on two bases. First, the court found that defense costs were not a type of risk that CIGNA Re had reinsured. Second, the court found that North River had violated its duty of good faith.[9] Accordingly, the court held that CIGNA Re was not bound to "follow the fortunes" of North River and relieved the reinsurer of liability for defense costs paid to Owens-Corning.

CIGNA Re later filed a motion for reconsideration under Federal Rule of Civil Procedure 59(e), requesting the court to find, as an alternative basis for summary judgment, that the indemnity limits constituted an absolute cap on CIGNA Re's

---

[9]. The district court concluded that CIGNA Re had demonstrated two instances of bad faith sufficient to warrant the grant of summary judgment. The court also found CIGNA Re had raised disputed issues of fact with respect to other alleged manifestations of bad faith and denied summary judgment to North River.

reinsurance liability.[10]  The district court denied CIGNA Re's

motion on the ground that it had not met its burden of proving

there had been an intervening change in controlling law that

warranted reconsideration of judgment.

C.

The parties now appeal.  The district court had

diversity jurisdiction under 28 U.S.C. § 1332(a)(1) (1988).[11]  We

have jurisdiction of North River's appeal of the grant of summary

judgment to CIGNA Re under 28 U.S.C. § 1291 (1988).  We also have

jurisdiction to review the denial of summary judgment to North

River because the district court granted CIGNA Re's cross-motion

for summary judgment.  See First Nat'l Bank v. Lincoln Nat'l Life

Ins. Co., 824 F.2d 277, 281 (3d Cir. 1987) (citation omitted)

("[A]n appellate court may remand with directions to enter

summary judgment on appellant's unsuccessful cross-motion for

summary judgment where there is no dispute as to the facts which

would justify judgment for the appellant.").  We will apply

plenary review of the indemnification and duty of good faith

issues.  Dickler v. CIGNA Property & Casualty Co., 957 F.2d 1088,

1094 (3d Cir. 1992) (district court's conclusion about the legal

operation of an insurance policy is subject to plenary review);

---

[10].  CIGNA Re had disavowed this defense during discovery, but
pressed it upon learning another insurer had successfully used it
against North River in Unigard III, 4 F.3d at 1057.  See
discussion infra part VI.

[11].  North River is a New Jersey corporation with its principal
place of business in New Jersey.  CIGNA Re is a Delaware
Corporation with its principal place of business in Pennsylvania.

Ram Constr. Co. v. American States Ins. Co. 749 F.2d 1049, 1053 (3d Cir. 1984) (construction of legal effect of a contract involving no factual issues requires a determination of law and our standard of review is plenary).

Generally, the denial of a motion for reconsideration is reviewed for an abuse of discretion. Koshatka v. Philadelphia Newspapers, Inc., 762 F.2d 329, 333 (3d Cir. 1985). Where a district court's denial of a motion to reconsider is based upon the interpretation of legal precepts, however, our review of the lower court's decision is plenary. McAlister v. Sentry Ins. Co., 958 F.2d 550, 552-53 (3d Cir. 1992). But, to the extent that the district court's order was based on a factual conclusion, we review under a "clearly erroneous" standard. Ram Constr., 749 F.2d at 1053. Accordingly, we apply a "clearly erroneous" standard of review to the court's finding that CIGNA Re failed to raise the limits defense before the summary judgment order was filed. But our review of the court's finding that Unigard III is not an intervening change in controlling law is plenary because that denial was based upon the interpretation and application of a legal precept.

### III.

In its appeal, North River contends the district court misinterpreted the reinsurance certificates. Specifically, it claims the court misapplied the "follow the fortunes" clause, improperly conducted de novo review of the arbitrator's resolution of its coverage dispute with Owens-Corning, and wrongly concluded that defense costs were not covered under the

original policy as reinsured.[12]  CIGNA Re argues that defense costs were not covered under the North River-Owens-Corning policy and that the district court properly relieved CIGNA Re of its obligation to "follow the fortunes" because North River's liability for costs stemmed from its decision to enter the Wellington Agreement and its failure to abide by Wellington procedures.  Under New York law,[13] proper application of "follow the fortunes" requires us to analyze North River's coverage under the original policy to determine whether defense costs were outside the scope of the policy's coverage as reinsured.  We also must determine whether the Wellington Agreement provided coverage where there had been none.

North River contends such analysis is an impermissible de novo review of the arbitration.  We disagree.  "Follow the fortunes" forecloses relitigation of coverage disputes because when an insurer disclaims coverage its interests are generally aligned with those of its reinsurer.  Permitting reinsurers to revisit coverage issues would place insurers in an untenable position.  Inevitably, defenses insurers advanced in coverage contests would be used against them by reinsurers seeking to deny coverage.  Accordingly, a reinsurer challenging coverage may

---

[12].  North River also maintains the district court erred in its conclusions about the insurer's breach of the duty of good faith. We discuss the good faith issues _infra_ at part IV.

[13].  In accordance with the parties' stipulation, we will apply New York law to interpret the reinsurance contract and Ohio law to interpret the underlying insurance contract.

obtain only deferential review of a determination of the

insurer's liability to the insured:

> [W]hat follow the fortunes does is to eliminate the possibility of the reinsurer's asking a court or an arbitration panel for a de novo determination of whether the settled claim was or was not within the scope of the cedent's policy. . . .
>
> Follow the fortunes imposes a very different standard of review. A reinsurer is bound to follow its cedent's fortunes in settling claims unless the reinsurer can show that the cedent did not act in good faith or after conducting a reasonable investigation. Thus, a court or panel, faced with a reinsurer's denial of liability, would ask not whether the underlying claim was covered by the cedent's policy, but whether there is any reasonable basis to conclude there was such coverage. Only if the ceding company pays a claim that is clearly outside the scope of its policy, would the reinsurer's challenge be sustained.

Clifford H. Schoenberg, L'Histoire Ancienne De "Follow the Fortunes", Mealey's Litigation Reports (Reinsurance), May 28, 1992, at 17, 20.

We do not believe that asking whether the risk was unreinsured is tantamount to de novo review. Although the arbitrator found that the original policy did not exclude coverage for defense costs, he acknowledged that the arbitration proceeding was "unique in that both the language of the policy and the language of the Wellington Agreement [were] material to the interpretation to be made." Arb. Op. at 17. Accordingly, we will consider whether the arbitrator could have reached the same result without the intervening Wellington Agreement. Because "follow the fortunes" doctrine does not require the reinsurer to

cover risks undertaken after the certificate of reinsurance is issued, CIGNA Re is not liable for coverage occasioned only because of the Wellington Agreement.

A.

The reinsurance certificates employed standard language, providing, "[T]he liability of [CIGNA Re] . . . shall follow that of [North River] and except as otherwise specifically provided herein, shall be subject in all respects to all the terms and conditions of [North River's] policy except such as may purport to create a direct obligation of [CIGNA Re] to [Owens-Corning]." Reinsuring Agreement ¶ A.  The certificate continued:    All claims involving this reinsurance, when settled by [North River], shall be binding on [CIGNA Re], which, shall be bound to pay its proportion of such settlements, and in addition thereto, . . . its proportion of expenses . . . incurred by [North River] in the investigation and settlement of claims or suits and, with the prior consent of the Reinsurer to trial court proceedings, its proportion of court costs and interest on any judgment or award.

Id. ¶ C.  North River maintains the district court's failure to credit this language constituted a basic flaw in its analysis denying indemnification.

The district court characterized the first part of the quoted provisions as a "following forms" clause, suggesting that a "following forms" clause provides somewhat narrower coverage than a "follow the fortunes" clause, only obligating the reinsurer to cover risks insured under the original policy. North River, 831 F. Supp. at 1143.  The district court recognized that "follow the fortunes" doctrine goes further and requires indemnification for all payments made in good faith that are reasonably within the scope of the policy's coverage.  Id.  The CIGNA Re reinsurance certificate contained both "following forms" and "follow the fortunes" clauses.  But the district court discounted the import of the "follow the fortunes" language, erroneously limiting that doctrine to settlements.

The district court called the phrase "follow the fortunes" a misnomer, believing "[t]he British term, `follow the settlements,' more accurately characterize[d] the effect of such a clause."  Id.  The court went on to note, "The clause itself states that `all claims involving this reinsurance, when settled by [North River], shall be binding on [CIGNA Re] . . . .' (emphasis added.)  It does not state that CIGNA Re shall follow in the fortune, good or bad, of any litigation involving the underlying policy."  Id.  We believe the district court erred

when it limited "follow the fortunes" doctrine to settlements.[14]

Despite the explicit reference to "settlements" in the typical

"follow the fortunes" clause, it is well settled that the

principle applies generally to all outcomes of coverage disputes,

whether in the form of settlements or judgments.[15]  See 13A John

A. Appleman & Jean Appleman, Insurance Law and Practice § 7698

(1976) (and cases cited therein) (reinsurer is generally bound by

the judgment against the reinsured).[16]  Thus, we find the clause

applies both to settlements and to judgments.[17]

_____

[14].  We note, however, that despite stating that "follow the
fortunes" clauses should be limited to settlements, the district
court nevertheless went on to analyze this case under "follow the
fortunes" doctrine.

[15].  We see no difference between the effects of court judgments
and arbitration decisions for "follow the fortunes" purposes.  To
find otherwise would thwart "the announced policy of [the State
of New York which] favors and encourages arbitration as a means
of conserving the time and resources of the courts and the
contracting parties."  Nationwide Gen. Ins. Co. v. Investors Ins.
Co. of America, 332 N.E.2d 333, 335 (N.Y. 1975).

[16].  This principle is so well settled that there is a virtual
absence of contemporary case law on the issue.  See Charles W.
Havens, III, Recent Developments on the "Follow the Fortunes"
Clause, in Reinsurance Litigation 1994:  Current Issues and
Strategies at 27, 35-36 (PLI Com. Law and Practice Course
Handbook Series No. 695, 1994) ("Where a judgment has been
entered against the reinsured, and the judgment is for risks
covered under the reinsurance agreement, there is little room for
the reinsurer to deny indemnification of the reinsured up to the
stated policy limits, absent a lack of good faith in defending
the action.  As such, most litigation involves the reinsured's
settlement of a claim for which it then seeks indemnification
from the reinsurer.")
        Older cases involving reinsurance applied to judgments
the doctrine described by an early treatise writer, Franciscus
Roccus (d. 1676): iste secundus assecurator tenetur ad solvendum
omne totum quod primus assecurator solverit.  We translate
Roccus's doctrine as, "the reinsurer is held in full to the
result that the primary insurer obtained," and equate it with

1.

"Follow the fortunes" doctrine protects the risk transfer mechanism by providing that covered losses pass uninterrupted along the risk transfer chain.  The same legal determinations that define the insurers' obligations must apply to reinsurers as well.  See 13A Appleman & Appleman, supra, § 7698 (and cases cited therein) ("The reinsurer is generally bound by the judgment against the reinsured . . . .").  Generally, when an insurer loses -- or settles -- an underlying coverage dispute, "follow the fortunes" makes the payment to the insured binding on the reinsurer.  See Mentor Ins. Co. (U.K.) v. Brannkasse, 996 F.2d 506, 517 (2d Cir. 1993) ("The follow-the-fortunes principle . . . simply requires payment where the [insurer's] good-faith payment is at least arguably within the scope of the insurance

(..continued)
"follow the fortunes."  See Hastie v. De Peyster, 3 Cai. R. 190, 194-95 (N.Y. 1805) (insurer litigated and lost a coverage dispute with insured;  reinsurer liable for judgment and for costs charged to the insurer); c.f. New York State Marine Ins. Co. v. Protection Ins. Co., 18 F. Cas. 160, 160-161 (C.C. Mass. 1841) (applying New York law, found reinsurer bound to pay judgment and costs awarded against insurer in coverage suit with insured so long as suit conducted in good faith).

[17]. We observe that the arbitration outcome between Owens-Corning and North River may be a hybrid, possessing qualities of both a decision and a settlement.  The Wellington Agreement has been accurately described as "a global settlement."  See, e.g., Kenneth S. Abraham, Cleaning Up The Environmental Liability Insurance Mess, 27 Val. U. L. Rev. 601, 607 (1993).  Accordingly, resolutions of coverage disputes under the terms of Wellington arguably may be settlements, rather than judgments.  The parties to this dispute, however, have characterized the arbitrator's decision as a judgment.  Because we find that "follow the fortunes" doctrine applies to judgments as well as to settlements, we need not refine the distinction here.

coverage that was reinsured."); Christiania Gen. Ins. Corp. v. Great Am. Ins. Co., 979 F.2d 268, 280 (2d Cir. 1992) ("A reinsurer cannot second guess the good faith liability determinations made by its reinsured . . . ."); Insurance Co. of New York v. Associated Mfrs.' Mut. Fire Ins. Co., 74 N.Y.S. 1038, 1039 (N.Y. App. Div. 1902), aff'd, 66 N.E. 1110 (N.Y. 1903) ("In the absence, therefore, of fraud or bad faith on the part of the [insurer], the [reinsurer], by the terms of its policy . . . is in no position to object to the mode of adjustment as made by the [insurer]."). Thus, "follow the fortunes" doctrine creates an exception to the general rule that contract interpretation is subject to de novo review. See, e.g., Schoenberg, supra, at 20 ("Follow the fortunes imposes a very different standard of review. . . . [A] court or panel, faced with a reinsurer's denial of liability, would ask not whether the underlying claim was covered by the cedent's policy, but whether there is any reasonable basis to conclude there was such coverage.")

2.

There are compelling policy reasons that counsel against de novo review under "follow the fortunes" doctrine. Although the interests of a primary insurer and its insured may often be adverse, "the interests of a reinsurer and the ceding primary insurer with respect to a pending claim are generally identical. . . . [T]he interests of both parties are furthered through the primary insurer's efficient investigation and defense of the claim and through the resolution of the claim on the best terms possible." Unigard Sec. Ins. Co. v. North River Ins. Co.,

594 N.E.2d 571, 574 (N.Y. 1992) (citations omitted) ("Unigard II"). To permit the reinsurer to revisit coverage issues resolved between the insurer and its insured would place insurers in the untenable position of advancing defenses in coverage contests that would be used against them by reinsurers seeking to deny coverage. Accordingly, "follow the fortunes" doctrine generally forecloses relitigation of coverage disputes because:

> Were the Court to conduct a de novo review of [the insurer's] decision-making process, the foundation of the cedent-reinsurer relationship would be forever damaged. The goals of maximum coverage and settlement that have been long established would give way to a proliferation of litigation. Cedents faced with de novo review of their claims determinations would ultimately litigate every coverage issue before making any attempt at settlement."

International Surplus Lines Ins. Co. v. Certain Underwriters & Underwriting Syndicates at Lloyd's of London, 868 F. Supp. 917, 921 (S.D. Ohio 1994).

### 3.

But, "[w]hile the `follow the fortune' clause is certainly a broad one, it is clear that the reinsurer is liable only for `a loss of the kind reinsured.'" Insurance Co. of N. Am. v. United States Fire Ins. Co., 322 N.Y.S.2d 520, 523 (N.Y. Sup. Ct. 1971) (quoting Western Assurance Co. v. Poole, 1 K.B. 376) (1903)), aff'd, 348 N.Y.S.2d 122 (N.Y. App. Div. 1973). "It would be an unwarranted and indeed tortured construction of that clause to hold a reinsurer bound, for example, to pay if the prime insurer paid monies to its insured on a claim completely

without the scope of the policy and not in good faith." <u>Id.</u>; <u>see also</u> Gregory & Christakos, <u>supra</u>, at 544 & n.40 (and cases cited therein) (reinsurer is only responsible for covered claims). Where the reinsured's liability attaches from a settlement or binding judgment, the reinsurer is not accountable if the liability arises from uninsured activity. <u>See</u> 2 Klaus Gerathewohl et al., <u>Reinsurance Principles and Practice</u> ch. 14, at 51 (John C. La Bonte trans., 1980) ("Since the freedom of the reinsurer to assume or refuse a risk is a typical element of facultative reinsurance, it would be contrary to this type of reinsurance if the reinsurer were obliged to follow subsequent -- factual or contractual -- changes in the underlying direct insurance.").

This protection for the reinsurer is based on principles of contractual intent: a reinsurer cannot be held liable for a kind of loss that it did not agree to cover. This distinction between reinsured and unreinsured risk is particularly important in facultative reinsurance where the reinsurer accepts only specific risks. Thus, for example, in <u>Insurance Co. of North America</u>, 322 N.Y.S.2d at 524, the court found a reinsurer was not liable to cover a payment for lost cargo under a facultative certificate where the loss was due to a "shore risk" that was not insured under the original policy because "[t]he defendant never consented to reinsure this loss not covered in the original insurance policy." In <u>Bellefonte Reinsurance Co. v. Aetna Casualty & Surety Co.</u>, 903 F.2d 910 (2d Cir. 1990), Aetna had settled a coverage dispute with A.H.

Robins, manufacturer of the Dalkon Shield, agreeing to pay an amount substantially in excess of the cap stated in the reinsurance certificates. The court rejected the insurer's claim that its reinsurer should cover these payments because "[s]uch a reading would be contrary to the parties' express agreement and to the settled law of contract interpretation." Id. at 913. And in American Insurance Co. v. North American Co. for Property & Casualty Insurance, 697 F.2d 79, 80-81 (2d Cir. 1982) ("NACPAC"), the court held the reinsurer was not obligated to "follow the fortunes" of the insurer in making a settlement that covered punitive damages resulting from corporate misconduct because the underlying policy and the reinsurance certificate did not cover such misconduct.

4.

The arbitrator held North River liable to pay Owens-Corning's defense costs. Both parties contend the basis of that holding forms the heart of this dispute and their arguments raise competing principles. On the one hand, in order to preserve "follow the fortunes" doctrine, courts may not conduct de novo review of a judgment imposing liability on the insurer. On the other, to protect the contractual intent of the parties, courts must reexamine the judgment to determine whether the liability represents a risk not contemplated by the terms of the underlying policy as reinsured. But "follow the fortunes" doctrine requires a court to find reinsurance coverage unless the reinsurer demonstrates the liability to the insured was the result of fraud and collusion or not reasonably within the scope of the original

policy.[18]  We conduct plenary review of the district court's interpretation of the reinsurance certificates and its application of controlling legal principles.  See New Castle County v. Hartford Accident & Indem. Co., 933 F.2d 1162, 1183 (3d Cir. 1991) (standard of review of district court's interpretation of insurance polices and its application of controlling legal principles is plenary).  In applying the doctrine of "follow the fortunes," the district court properly required CIGNA Re to show that the underlying policy language "as a matter of Ohio law, unambiguously provides that the policies do not pay defense costs."  North River, 831 F. Supp. at 1144 (citing NACPAC, 697 F.2d at 80-81).  But we believe the district court misapplied this standard and came to the wrong conclusion.  CIGNA Re has not made the required showing.

### B.

 CIGNA Re claims defense costs were not reinsured because they were not covered under the original insurance policy.  Accordingly, "[t]o determine what type of loss was reinsured, we must turn to the original insurance contract."  Insurance Co. of N. Am., 322 N.Y.S.2d at 523.  North River insured Owens-Corning against "ultimate net loss," North River-Owens-Corning Insuring Agreement ("Insuring Agreement") ¶ 1, which was defined as "the sums paid in settlement of losses for

---

[18].  We will address the reinsurer's allegations of bad faith later in the opinion.  Here we will limit our discussion to CIGNA Re's contention that the payments made were outside the scope of the policy as reinsured.

which the Insured is liable . . . and shall exclude all `Costs.'" Id. ¶ 13.  The policy defined "costs" as "interest on judgments, investigation, adjustment and legal expenses."  Id. ¶ 14.[19]  The policy, however, also provided that costs incurred by Owens-Corning "with the written consent of [North River]" would be apportioned.  Id. ¶ 15.  Elsewhere the policy referred to North River's "obligation to pay any ultimate net loss and costs" when underlying limits have been paid.  Id. ¶ 11.

The policy did not include a duty to defend clause. Instead, the policy included a provision holding Owens-Corning "solely responsible for the investigation, settlement, defense and final disposition of any claim made or suit brought or proceeding instituted against the Insured . . . ."  Id. ¶ 9. Another provision stated:

> At no time shall [North River] be called upon to assume charge of the settlement or defense of any claims made or suits brought or proceedings instituted against [Owens-Corning], but [North River] shall have the right and shall be given the opportunity to associate  with [Owens-Corning] or its underlying insurer or insurers, or both, in the control, defense and/or trial of any claims, suits or proceedings which, in the opinion of [North River], involves or appears reasonably likely to involve [North River].

Id. ¶ 8.

_____

[19].  The policy excluded from "costs" expenses and regular fees for "counsel on general retainer" and "office expenses of the Insured."  Neither of the parties to this dispute has addressed the significance of this "exclusion within an exclusion."  See infra note 20 for a discussion of the Sixth Circuit's treatment of an identical provision.

The parties have stipulated that Ohio law governs the interpretation of the underlying insurance policy. Accordingly, we must turn to Ohio case law to interpret the provisions relating to the exclusion for costs.

1.

Ohio law places the burden of proving an exclusion from coverage on the insurer. "An exclusion must be stated clearly in explicit wording setting forth with specificity exactly what is to be excluded." River Servs. Co. v. Hartford Accident & Indem. Co., 449 F. Supp. 622, 626 (N.D. Ohio 1977) (citing numerous cases); see also Moorman v. Prudential Ins. Co., 445 N.E.2d 1122, 1124-25 (Ohio 1983) (citation omitted) ("[T]hat which is not clearly excluded from the operation of such contract is included in the operation thereof. . . . If it were intended that the exclusion should apply in this circumstance, then language so extending application of the exclusion could have been incorporated into the policy.").

The arbitrator, too, placed the burden of proving an exclusion from coverage on the insurer, believing North River needed to prove that the policy language relieved it of the duty to pay defense costs. Under the terms of the original policy, the arbitrator found the exclusion for costs was qualified by the consent provision. The arbitrator stated, "The condition of consent does not constitute an exclusion of the obligation of the insurer to pay costs," and concluded that North River had not carried its burden of proving the exclusion for costs applied. Arb. Op. at 20, 22-23.

It is well established under Ohio law that:
> The meaning of a contract is to be gathered from a consideration of all its parts, and no provision is to be wholly disregarded as inconsistent with other provisions unless no other reasonable construction is possible.
> A special provision will be held to override a general provision only where the two cannot stand together. If reasonable effect can be given to both, each is to be retained.

Karabin v. State Auto. Mut. Ins. Co., 462 N.E.2d 403, 406–07 (Ohio 1984) (quoting German Fire Ins. Co. v. Roost, 45 N.E. 1097, 1097–98 (Ohio 1897) (paragraphs 1 and 2 of syllabus). Although the treatment of defense costs under the Owens-Corning–North River policy is inconsistent, the arbitrator's interpretation gives reasonable effect to the various parts. For example, although at paragraph one of the policy North River agreed to indemnify Owens-Corning against "ultimate net loss," which was defined to exclude "costs," paragraph eleven referred to North River's obligation to pay both ultimate net loss and costs. The arbitrator reasonably interpreted these apparent inconsistencies as providing a limited exclusion for costs.

The district court focused on paragraph fifteen of the policy, which refers to the apportionment of costs incurred "with the written consent of the Company," and found that North River could only be liable for defense costs associated with litigation or settlement to which it had given its formal consent. But such a literal reading of paragraph fifteen would be inconsistent with paragraph eleven of the policy, which provides that North River's

obligation to pay costs shall not attach until the underlying limits have been paid.  Compliance with both paragraphs is practically infeasible.  Read literally, these paragraphs would require an insured to obtain written consent from its excess insurer before it could permit its primary insurer to engage in litigation or settlement in its behalf -- even though the excess insurer would not be responsible for the resulting liability unless the primary insurer's limits were exhausted.  Strict construction of both provisions would yield an unreasonable effect.

After examining the policy language, the arbitrator determined, "The word `consent' and associated words employed in [the insurance policy] are not to be given their plain or literal meanings . . . ."  Arb. Op. at 23.  Having implicitly found an ambiguity, he looked to extrinsic evidence to explain the meaning of consented-to costs.  He noted that credible evidence established that these words have particular meaning within the insurance industry and relied on testimony that the condition of consent is a term of art within the insurance industry.  Id.  For example, Graves Hewitt, an insurance consultant and former Chief Executive Officer of First State Insurance Company, stated that it would be "very rare" for an insured to make a formal request of an insurer for consent.  Id. at 20.  C. James Ayliffe, a retired British insurance executive "whose substantial career was involved within the American insurance market," testified that he had never experienced a case where the insured would go to the excess carrier for consent to costs being incurred.  Id.  And

William G. Carson, Director of Home Office Underwriting for Crum & Forster, explained that a policy requirement that written consent be obtained before costs are incurred does not necessarily constitute a condition to the payment of costs.  Id. Therefore, on the basis of the language of the policy and industry practice, the arbitrator concluded that the inconsistent provisions could not establish an express exclusion of coverage.[20]  Id. at 23.  We believe the arbitrator's interpretation is not unreasonable under Ohio law and gives

_____

[20].  Recently, the Court of Appeals for the Sixth Circuit addressed this question in a similar context and, finding an ambiguity in an insurance policy, ordered a remand for consideration of extrinsic evidence of intent to cover defense costs.  In Affiliated FM Insurance Co. v. Owens-Corning Fiberglas Corp., 16 F.3d 684 (6th Cir. 1994), the court considered an identical definitional provision, but focused on different language:  Within the paragraph excluding costs from the definition of loss, a parenthetical excluded from the exclusion in-house defense costs.  The court noted that neither the district court nor the parties was "able to explain, without looking outside of the policy, why the definition of loss would carve out" this exception within an exception.  Id. at 687.  The court then found the policy ambiguous because, under Ohio law, "contracts are not to be interpreted in a manner that renders any phrase surplusage."  Id.
          Neither North River, Owens-Corning, nor the arbitrator addressed whether the same parenthetical exclusion within the exclusion rendered the definition of costs ambiguous in this case.  Without adopting the Sixth Circuit's conclusion, we nevertheless note that the presence of such an ambiguity might have defeated North River's efforts to establish an express exclusion for costs.  It is well settled under Ohio law that provisions in an insurance contract that are "reasonably susceptible of more than one meaning will be construed liberally in favor of the insured and strictly against the insurer." Faruque v. Provident Life & Accident Ins. Co., 508 N.E.2d 949, 952 (Ohio 1987) (citing numerous cases).  Accordingly, we note that application of this rule to the provision could have yielded the conclusion that defense costs were covered.

effect to the inconsistent requirements of prior consent and exhaustion of underlying limits in the policy.

2.

To deny reimbursement under "follow the fortunes" doctrine, the reinsurer must show that the arbitrator's decision allowed coverage of defense costs that were not reasonably within the scope of the policy.  See, e.g., North River, 831 F. Supp. at 1144 (requiring demonstration that underlying policies "unambiguously" do not pay defense costs).  Accordingly, it is CIGNA Re's burden to prove that Ohio law would not support the arbitrator's construction of the policy.  CIGNA Re, however, has neither relied on nor cited to any Ohio case directly on point. Nor have we found any.

The arbitrator asserted, without citation to supporting cases, that his interpretation of the consent clause was "consistent with the overwhelming body of American case law which declares where the reservation to consent to a material contract matter is made, such consent cannot unreasonably be withheld." Arb. Op. at 22.  Consent clauses are drafted for the benefit of insurers -- they are intended to protect insurers against liability for mishandled suits and settlements.  See 7C Appleman & Appleman, supra, § 4681 (provision requiring insurer's prior consent gives insurer right to protect itself against unwarranted liability claims).  Ohio courts construing such language have required reimbursement despite the absence of formal consent,

finding the condition applies only where consent has been reasonably withheld.[21]

The district court stated that "cases from numerous other jurisdictions support the conclusion that these policy terms unambiguously do not provide for the payment of defense costs." North River, 831 F. Supp. at 1145. The cases cited by the district court linked liability for defense costs to an insurer's duty to defend, relieving insurers of liability for costs where there was no duty to defend.[22] We note, however, that because these cases come from jurisdictions other than Ohio, they do not control our interpretation of the insurance contract.

Although the district court believed that the policies did not contemplate North River consenting to pay defense costs without first agreeing to associate in the defense, the arbitrator declined to link the consent clause to the exclusion

[21]. See, e.g., Bogan v. Progressive Casualty Ins. Co., 521 N.E.2d 447, 452 (Ohio 1988) ("[A]n insurer may not avoid coverage by unreasonably refusing to consent to a settlement . . . ."); Motorists Mut. Ins. Co. v. Handlovic, 492 N.E.2d 417, 419 (Ohio 1986) ("An insurer may not avoid a valid judgment obtained by an insured . . . solely because the insurer did not provide written consent to the prosecution of the action resulting in the judgment."); c.f. American Employers Ins. Co. v. Metro Regional Transit Auth., 802 F. Supp. 169, 183 (N.D. Ohio 1992) (insured had a right to be reimbursed for its expenditures where insurer wrongfully refused to defend), rev'd on other grounds, 12 F.3d 591 (6th Cir. 1993).

[22]. See Chubb/Pacific Indem. Group v. Insurance Co. of N. Am., 233 Cal. Rptr. 539, 543 (Cal. Ct. App. 1987); Cornhusker Agric. Ass'n v. Equitable Gen. Ins. Co., 392 N.W.2d 366, 372 (Neb. 1986); Crown Ctr. Redevelopment Corp. v. Occidental Fire & Casualty Co., 716 S.W.2d 348, 357 (Mo. Ct. App. 1986); Chicago & Illinois R.R. Co. v. Reserve Ins. Co., 425 N.E.2d 429, 433–34 (Ill. App. Ct. 1981).

of a duty to defend.  He found that the language in paragraphs eight and nine, making the insured "solely responsible" for the defense effort and acquitting North River of any responsibility to assume charge of the defense effort, was "not dispositive of any substantive economic matter" but controlled the assignment of procedural responsibilities.  Arb. Op. at 18.  We do not think it was unreasonable to interpret this policy without linking the obligation to pay defense costs to a duty to defend.  It would appear that an excess insurer and its insured would have good reason to omit a duty to defend clause from an excess policy:  in most instances the primary insurer already would have accepted the duty to defend the insured.  That reason, however, does not compel the conclusion that the insured also intended to relieve the excess insurer of all liability for defense costs accrued in excess of the primary insurer's limits -- especially when such costs would be incurred in an effort to avoid liability that the excess insurer would have to pay.  Accordingly, we cannot agree with the district court that under the facts of this case an agreement to pay costs must be linked to acceptance of a duty to defend.

C.

CIGNA Re relies on the district court's finding that the arbitrator's decision was based on the Wellington Agreement and was not supported by the language of the original policies as reinsured.  North River, 831 F. Supp. at 1145.  But we believe the district court erred when it concluded that the arbitrator's decision was not supported by the underlying insurance policies.

The arbitrator devoted several pages of his opinion to an analysis of the condition of consent to the payment of defense costs in the insurance policy. He concluded North River was obligated to cover Owens-Corning's defense costs because the insurer had failed to meet its burden of establishing that the policy excluded coverage of defense costs. Arb. Op. at 19-23.

The district court rejected the arbitrator's conclusion, adopting instead the reasoning of courts from jurisdictions other than Ohio to interpret the policy. But this de novo review of the arbitrator's judgment was improper. As we have noted, the purpose of "follow the fortunes" doctrine is to preserve the risk transfer mechanism. Without "follow the fortunes" doctrine, reinsureds would be in the impossible position of advancing defenses in coverage contests that could be used against them by reinsurers seeking to deny liability. This would frustrate the expectations of the reinsurance relationship. To that end, the doctrine forecloses courts from conducting de novo review of dispositions of coverage disputes between insurers and their insureds for the benefit of reinsurers. Generally, reinsurers are limited to two inquiries: first, they may ask whether an insurer engaged in fraud or collusion in the payment of a claim, and second, whether a claim arose from a risk clearly outside the policy as reinsured. Once those questions are answered in the negative, the reinsurer may not second guess the resolution of a particular dispute over coverage.

Accordingly, absent fraud or collusion, to avoid liability CIGNA Re had to show that the arbitrator's decision

ordered payments that were not reasonably within the scope of the policy as interpreted under Ohio law.  But the arbitrator's conclusion that defense costs are reasonably within the scope of coverage contemplated by the original policy is not inconsistent with Ohio law.  Because CIGNA Re has failed to establish that Ohio law would not support the arbitrator's construction of the insurance policy provision as requiring the insurer to pay defense costs, we hold CIGNA Re must follow North River's fortunes and reimburse for the defense costs paid.[23]

## 1.

CIGNA Re emphasizes that, under Wellington, there was a presumption of coverage for defense costs:  "[U]nless it expressly provides otherwise, each excess insurance policy . . . also shall pay allocated expenses . . . ."  Wellington Agreement § XI, ¶ 1.  CIGNA Re contends this provision changed the insurance coverage, and the reinsurer need not follow the insurer's fortunes because, before the Agreement, North River was not liable for defense costs.[24]  We disagree.  Under Ohio law,

---

[23].  We also recognize that CIGNA Re could have avoided liability for defense costs if it had expressly excluded such coverage in the reinsurance certificates it issued to North River.  The reinsurance certificates, however, did not contain such an exclusion.  On the contrary, the "follow the fortunes" clauses in the CIGNA Re–North River reinsurance certificates expressly refer to the reinsurer's obligation to reimburse for "court costs and interest on any judgment or award" arising out of consented-to litigation.  Reinsuring Agreement ¶ C.  Because CIGNA Re has not contended that its certificates excluded costs, we will not explore the implications of this provision.

[24].  CIGNA Re has noted that in another case involving North River excess insurance certificates, the Court of Appeals for the Second Circuit concluded that signing Wellington altered North

the standard for establishing an exclusion from coverage is substantially the same as that provided by Wellington: "An exclusion must be stated clearly in explicit wording setting forth with specificity exactly what is to be excluded." River Servs., 449 F. Supp. at 626. We have found that under this standard North River could have been liable for Owens-Corning's defense costs even before it signed onto Wellington. See supra part III.B.

Furthermore, we believe CIGNA Re's argument that the arbitrator's decision is tainted by Wellington's presumption of coverage for costs is misleading. It overlooks one purpose of "follow the fortunes" doctrine, which is to foreclose the relitigation of coverage disputes. Our analysis is governed by the inquiry required by "follow the fortunes" doctrine: Was the paid risk clearly outside the scope of the original policy's coverage? Because a reasonable interpretation of the original policy under Ohio law would allow coverage for defense costs, the arbitrator's decision survives our limited review. Therefore we

(..continued)
River's obligation to pay costs. Unigard III, 4 F.3d at 1068 ("[T]he Agreement altered North River's liabilities, including requiring it to pay some claims and administrative costs for which it was not liable under the original policies."); see also id. at 1066 ("[T]he signing of the Wellington Agreement substantially altered the terms of the reinsurance certificate."). Unigard III is distinguishable from our case, however. In Unigard III, the court found that the payments for which North River sought reinsurance coverage were made pursuant to an insurance-allocation formula that was purely a creature of the Wellington Agreement. Here CIGNA Re has not challenged the allocation formula. Thus, the Second Circuit's holding that the Wellington Agreement materially altered North River's coverage is not applicable to the dispute in this case.

hold that absent bad faith "follow the fortunes" compels coverage by the reinsurer.

IV.

We turn next to the question whether North River violated the duty of good faith implied in every reinsurance contract. To establish a breach of the duty, the district court required the reinsurer, CIGNA Re, to prove "(1) that the reinsured acted with gross negligence or recklessness, and (2) that the reinsurer as a result has suffered `prejudice,' defined as `economic injury.'" North River, 831 F. Supp. at 1146 (citing Unigard III, 4 F.3d at 1068–69). Holding that the failure to take all businesslike steps could constitute gross negligence, the court concluded that North River violated its duty to CIGNA Re through "gross negligence in: (1) failing to recognize how signing the Wellington Agreement materially expanded the defense obligation under the Owens–Corning policies, and (2) triggering the strict penalty in Appendix D of the agreement by failing to schedule the policies within the 20–day period." Id. North River contends the district court erred because bad faith requires a willful disregard of the reinsurer's interest. Although North River incorrectly states the applicable standard of care,[25] we hold that CIGNA Re has not established, as

_____

[25]. Under New York law, which the parties agree governs the reinsurance relationship, an insurer violates the duty of good faith where its conduct rises to the level of gross negligence or recklessness. See Unigard III, 4 F.3d at 1069. It is, therefore, not necessary to find willful disregard of the reinsurer's interests.

a matter of law, that North River breached its duty of good faith.  On the contrary, we find only two instances of North River's conduct that raise questions of bad faith.

A.

When analyzing the duty of notice owed by a reinsured to its reinsurer, the Court of Appeals for the Second Circuit described the duty as one of "utmost good faith, requiring the reinsured to disclose to the reinsurer all facts that materially affect the risk of which it is aware and of which the reinsurer itself has no reason to be aware." Christiania Gen. Ins. v. Great Am. Ins., 979 F.2d 268, 278 (2d Cir. 1992) (citing Sun Mut. Ins. Co. v. Ocean Ins. Co., 107 U.S. 485, 510 (1883)). Nevertheless, "because these contracts are usually negotiated at arms length by experienced insurance companies," the court went on to reject Christiania's characterization of the relationship between a reinsured and reinsurer as being inevitably fiduciary in nature. Id. at 280-81.  In the same vein, in Unigard III, the Second Circuit conceded that utmost good faith may not accurately describe the modern relationship of sophisticated insurers bargaining at "arms length." Unigard III, 4 F.3d at 1066. "Nevertheless," the court concluded, "because information regarding risks lies with the ceding insurer, the reinsurance market depends upon a high level of good faith to ensure prompt and full disclosure." Id. at 1066.

But in applying this standard, the Unigard III court required the reinsurer to show bad faith, not mere negligence. In Unigard III, the court held that North River's negligent

failure to give Unigard, its reinsurer, adequate notice of its signature to the Wellington Agreement did not breach its duty of good faith.[26] The court emphasized that "the proper minimum standard for bad faith should be gross negligence or recklessness." Id. at 1069.

The origin of the standard of utmost good faith lies in the insurer-insured relationship. But, as a recent commentator has noted, "[r]einsurance involves two sophisticated business entities familiar with the business of insurance who bargain at arm's length for the terms in their contract." Steven W. Thomas, Utmost Good Faith in Reinsurance:  A Tradition in Need of Adjustment,  41 Duke L.J. 1548, 1554 (1992).  Thomas notes, "The phrase `good faith' is used in a variety of contexts, and its meaning varies somewhat with the context." Id. (citing the Restatement (Second) of Contracts § 205 (1981)).  He reasons, "[T]he differences between original insurance and reinsurance argue for a more fact-specific application of the good faith standard." Id. at 1553.  In our view, the approach taken by the

---

[26]. Unigard III addressed two issues that have not been raised in this dispute. First, Unigard had objected to the effects of Wellington because, under the Agreement, North River and Unigard became liable for a greater proportion of claims due to an insurance-allocation formula peculiar to the Agreement. Unigard III, 4 F.3d at 1066. That provision of Wellington is not raised in this dispute. See supra note 24. Second, in Unigard III, the reinsurance certificates gave the reinsurer the right to associate in the defense and settlement of claims, but under Wellington the Facility became the "sole agent" and had "exclusive authority and discretion to administer, evaluate, settle, pay or defend all asbestos-related claims." Id. This issue has not been raised in the present dispute, either.

Second Circuit in Unigard III applies an appropriate standard of good faith.  We adopt that standard in the reinsurance context.

The district court granted summary judgment to CIGNA Re, finding North River had violated its duty of good faith by gross negligence in (1) failing to recognize how signing the Wellington Agreement materially expanded the defense obligation under the original policies, and (2) triggering the strict penalty in Appendix D of the Agreement by failing to schedule. North River, 831 F. Supp. at 1146.  The district court found other evidence of bad faith that it did not rely on in granting summary judgment to CIGNA Re because the evidence presented disputed questions of fact:  specifically, North River's rejection of the compromise settlement, its failure to inform CIGNA Re of the nature of the settlement, and its failure to keep CIGNA Re apprised of the progress of the arbitration proceeding. Id. at 1147-48.  The district court also noted that North River's decision to drop the appeal could have raised a question of bad faith, but found the unlikelihood of success meant that no economic prejudice resulted to CIGNA Re.  Id. at 1148.

1.

The district court noted that before signing onto Wellington, Crum & Forster did not perform a cost-benefit analysis of the Agreement's impact on various types of policies and, particularly, did not analyze the effect on the Owens-Corning policies.  Id. at 1146-47.  But Crum & Forster made a general assessment of the benefits Wellington offered to its policyholders, to itself as an insurer, and to its reinsurers.

The company decided to join Wellington "because it was unconscionable that public money was being wasted the way it was."  See Heap Dep. at 119, reprinted in app. at 1816.  Before signing Wellington, senior executive officers at North River's corporate parent, Crum & Forster, evaluated the proposal and considered the overall benefits of entering into the Agreement. Ian Heap, a Senior Vice President who was the senior executive officer responsible for Crum & Forster's participation in the Wellington negotiations, attended informational meetings and provided status reports to senior management.  And before entering into the final Agreement, Crum & Forster signed a "Conditional Subscription" to Wellington.  One of the conditions to proceeding with the final Agreement was the receipt of sufficient support from reinsurers.  To that end, the company alerted all its reinsurers that it was considering signing Wellington and asked for their opinions.  None of them questioned the decision.  Crum & Forster held meetings with reinsurers in May and June, 1985, and received reinsurer support for the idea of signing the Agreement.  A memorandum from Ian Heap reporting on these meetings concludes, "The commitment by major reinsurers in both the international and domestic markets to support the Facility was sufficient comfort to the majority of conditional insurer subscribers that most of them signed the final Agreement on June 19th."[27]   App. at 1831.  Thus, the record indicates

_____

[27].  Among the reinsurers North River believed had "accepted the basic principles and agreed the payments made by the Facility on these principles would be seen to be good payments" was INA Reinsurance Company.  App. at 1830.  CIGNA Re is the successor to

North River broadly considered the effect that signing the Agreement would have on its reinsurance coverage and made a deliberate judgment that it would be beneficial to participate.[28] Nevertheless, it appears that Crum & Forster failed to make a narrow analysis of the effect of Wellington on individual policies or policyholders and consequently on its reinsurance agreements.

We need not decide whether this failure raises a question of Crum & Forster's gross negligence or recklessness toward its reinsurers because to establish a breach of the duty of good faith, CIGNA Re also must show that it suffered prejudice due to North River's conduct. We have found, however, that the standard for establishing an exclusion from coverage was substantially the same under Wellington as under Ohio law, and the terms of the Agreement did not expand the coverage of the underlying policies. See supra parts III.B. and C. Accordingly,

(..continued)
INA Re. See North River, 831 F. Supp. at 1132 (caption), 1135 (text).

[28]. The district court referred to testimony by Ian Heap, relying on his statement that "if in their judgment reinsurers failed [to go along with Wellington], then we had the business risk of being without reinsurance, and it was one that I felt Crum and Forster was prepared to take." North River, 831 F. Supp. at 1137 (emphasis omitted). But Heap came to this conclusion because he was, "extremely concerned about the inability of the reinsurance community to articulate its position clearly of whether or not it was to give full support to the Wellington Agreement." He testified, "It seemed to me that the industry had to move along the path of this alternative dispute resolution, and in the public interest we as insurers had to go along with it." Id. We do not believe this testimony establishes bad faith.

we find, as a matter of law, that CIGNA Re cannot show economic prejudice due to North River's entry into Wellington.

2.

The district court found that North River's failure to abide by the scheduling procedures amounted to gross negligence and resulted in economic prejudice to CIGNA Re. North River, 831 F. Supp. at 1147. We believe, however, that these are disputed questions of material fact. North River did not execute the scheduling certificate for the Owens-Corning policies, and under the Wellington Agreement an insurer who did not execute the scheduling certificate within twenty days of signing was deemed to have assented to the schedules as submitted by the insured. But we cannot say, as a matter of law, whether under these circumstances noncompliance with the scheduling procedure amounts to gross negligence or recklessness and whether, as a result, CIGNA Re suffered economic injury. These are questions for the trier of fact.

The record indicates that before signing the Agreement, representatives from Crum & Forster and Owens-Corning, along with other manufacturers and insurers, met in Pittsburgh to discuss outstanding issues pertaining to the Wellington Agreement. The policy schedules were discussed, and North River's representatives took the position that defense costs were not covered by its excess policies. Owens-Corning maintained they were covered. The meeting ended with the parties agreeing to disagree. Following the final execution of the Wellington Agreement, Owens-Corning submitted schedules of expected coverage

and certificates indicating its policy form designation concerning defense costs.[29] Robert Clare, a representative from Crum & Forster who was actively involved in evaluating the Wellington Agreement and who had attended the Pittsburgh meetings, drafted a letter response with eight paragraphs of coverage reservations. This letter also noted that Crum & Forster "understood a final determination re any Policy Form has not been made" with respect to defense costs. See McMahon Dep. at 124, reprinted in app. at 1171 (deposition transcript quoting letter).

At arbitration, North River argued Owens-Corning's defense costs were not covered and claimed it had expressed its continuing disagreement with a "G" designation to Owens-Corning at the Pittsburgh meeting and in the Clare letter. The arbitrator found, however, that the right to challenge a policy's designation could be exercised only by employing Wellington's scheduling procedures, and that even if the Agreement did permit alternative methods of noting disagreement, North River's letter did not sufficiently communicate a rejection of the "G" designation. Arb. Op. at 12-15.

The district court found that North River's conduct violated the duty of good faith. In light of the Agreement's sanction for failing to execute the scheduling form, North

---

[29]. As we have noted, those certificates designated the policies as form "G," which provided, "[t]he insurance policy pays allocated expenses and such expenses do not apply against aggregate limits." See supra part II.A.

River's attempt to preserve its defense certainly was inadequate. Nevertheless, the detail of North River's letter response reflects its clear intent to preserve coverage defenses. Furthermore, we note that North River and Owens-Corning shared a history of dealing. At this stage, the Wellington Agreement was terra incognita to both companies and the parties who formed Wellington did so with the aim of encouraging discussion and non-litigious resolution of disagreements. We do not believe, on these facts, that the failure to execute the scheduling certificate establishes as a matter of law either gross negligence or recklessness. Instead, whether North River's conduct manifested gross negligence or recklessness is a disputed question of material fact.

Furthermore, to establish a breach of the duty of good faith, CIGNA Re must prove that it suffered economic injury because of North River's allegedly grossly negligent or reckless conduct. But even had North River complied with the scheduling requirements the outcome for CIGNA Re may not have been different.[30] Thus, this, too, is a question that must be resolved by the trier of fact.

3.

CIGNA Re contends that North River's behavior in connection with the initial arbitrator's settlement

---

[30]. Because Owens-Corning had scheduled the policies as "G," paying defense costs beyond policy limits, even if North River had scheduled properly, the arbitrator could have found that the policy language contemplated coverage of defense costs.

recommendation manifested bad faith.[31]  The district court found that CIGNA Re had presented evidence raising factual disputes on this point.  The district court discussed two events relating to the settlement recommendation.  First, the district court found evidence that North River failed accurately to inform its reinsurers of the nature of the settlement offered.  Second, the court considered whether North River's rejection of the settlement recommendation reflected a failure to act in a proper and businesslike manner toward its reinsurers.

In September, 1988, Crum & Forster wrote to its reinsurers that the mediator had recommended a settlement that would require payment of defense expenses in addition to policy limits.  North River, 831 F. Supp. at 1147-48.  In fact, however, the mediator had recommended that the parties settle on an "H" form designation, allowing payment of defense costs, but within policy limits.  Id. at 1148.  We do not believe the inaccuracy in the letter standing alone could establish gross negligence of the insurer's duty to its reinsurers.

But in further support of its contention that Crum & Forster's rejection of the settlement recommendation manifested bad faith, CIGNA Re proffered a January 29, 1988 memorandum from George B. Luteran describing a meeting where Crum & Forster officials discussed the possibility of compromising on the allocated costs issue.  The memorandum notes, "[I]f we were to

_____

[31].  The arbitrator had advised Crum & Forster to settle with Owens-Corning by designating the policies as "H," paying defense costs within indemnity limits.

compromise on the allocated costs issue we would have an extremely difficult time in recovering any money spent for such costs from our reinsurers." Supp. app. at 1965. It may be that the memorandum reflects a prediction that Crum & Forster's reinsurers would successfully defend against coverage of a settlement on the allocated costs issue. CIGNA Re contends this memorandum betrays North River's belief that its obligation to pay defense costs was due entirely to its failure to schedule and its desire to avoid acknowledging this to its reinsurer.

As we have noted, the duty of good faith requires the reinsured to align its interests with those of the reinsurer. We cannot say, as a matter of law, that, taken together, the September, 1988 letter and the January, 29, 1988 memorandum cannot show a breach of that duty. But we also note that a Crum & Forster official testified that North River had been advised during mediation that Owens-Corning would not accept the arbitrator's compromise. If Owens-Corning would not have accepted the settlement in any case, then CIGNA Re cannot establish the second prong of a breach of the duty of good faith: economic injury. We agree with the district court that whether these circumstances establish a breach of the duty of good faith remains a disputed issue of fact.

4.

According to the district court, North River kept "CIGNA Re in the dark on key elements of [the arbitration]

proceeding."[32]  North River, 831 F. Supp. at 1148.  We do not believe the evidence presented raises an issue of bad faith. As we have noted, bad faith requires an extraordinary showing of a disingenuous or dishonest failure to carry out a contract.  The standard is not mere negligence, but gross negligence or recklessness.  Unigard III, 4 F.3d at 1069.  In support of its finding, the district court noted that North River was late in providing CIGNA Re a complete copy of the arbitrator's thirty-one page opinion.  But after the arbitrator released his opinion, North River gave its reinsurers access to its files, which included a copy of the decision.  We do not believe North River's actions demonstrate gross negligence or reckless disregard of CIGNA Re's interests.

Furthermore, although North River did not provide CIGNA Re a full copy of the opinion, CIGNA Re was not prejudiced because it had already received a copy from another source shortly after the decision was announced.  As a matter of law, North River's behavior does not manifest disingenuous, dishonest, or grossly negligent conduct that caused economic harm to CIGNA Re.

5.

---

[32].  The district court did not base its grant of summary judgment to CIGNA Re on this failure to inform because it found that CIGNA Re had not suffered economic loss.  According to the district court, even had CIGNA Re been able to associate in the arbitration proceeding, it would not have changed the result because North River was bound to pay defense costs through its failure to schedule the policies properly.

Finally, the district court found that North River's conduct with respect to the appeal of the arbitration decision may have violated its duty of good faith. North River, 831 F. Supp. at 1148. But as the district court observed, "[t]he reinsurer has the burden of proving that the reinsured has not acted in good faith." Id. at 1146. Accordingly, CIGNA Re bore the burden of showing how North River's failure to apprise CIGNA Re of its abandonment of that appeal manifested gross negligence or recklessness, and how that failure caused CIGNA Re economic injury. North River, 831 F. Supp. at 1146 (citing Unigard III, 4 F.3d at 1068–69). The Wellington Agreement provided for an appeal process and required the Facility to maintain a list of appellate judges approved by the initial subscribers. Wellington Agreement Appendix C ¶ 11.3. In the event a party filed a notice of appeal, the Agreement provided a procedure for selecting a panel of three judges from the list. Id. Appendix C ¶¶ 11.4–11.6. The standard for reversal on appellate review under Wellington was clearly erroneous. Wellington Agreement Appendix C ¶ 100.2.

We believe North River had little chance of prevailing on appeal and we find no bad faith here.[33] In light of the

_____

[33]. The district court also found that North River's failure to schedule the policies made a successful appeal unlikely. North River, 831 F. Supp. at 1148. The district court came to that conclusion, however, because it found the arbitrator's decision was based on the Wellington schedules. As noted, we disagree with that finding. See supra part III.B. We believe the arbitrator's decision was based on his interpretation of the underlying policy and we believe an appellate panel would have affirmed the arbitrator's decision on that basis as well.

unlikelihood of success, North River's decision to forego an appeal cannot be characterized as reckless or grossly negligent. Furthermore, we agree with the district court that because of the unlikelihood of success on appeal, CIGNA Re could not establish the economic prejudice that forms the second prong of a claim of bad faith. North River, 831 F. Supp. at 1148. As a matter of law, we find North River's decision to forego the appeal cannot be characterized as reckless or grossly negligent and does not manifest bad faith.

V.

The district court also rejected North River's argument that the "following form" clause in the reinsurance certificates required CIGNA Re to pay the defense costs involving the Owens-Corning policies. In its summary judgment brief North River had contended that the "following form" clause also bound CIGNA Re to the terms of the underlying policy and that because the arbitrator held the terms of the underlying policies required North River to pay defense costs in addition to policy limits, CIGNA Re was likewise bound. The district court rejected this contention on two bases: First, the court held that CIGNA Re was not bound by the arbitrator's decision because the reinsurer had not been a signatory to Wellington. Second, the court believed the arbitrator relied on the Wellington Agreement, and not on the underlying policies, in requiring payment of defense costs. We disagree.[34]

---

[34]. North River has not addressed the "following forms" issue in its appeal. Because we have found CIGNA Re bound to cover North

Arbitration is a favored means of dispute resolution, especially in the insurance industry,[35] and it would thwart that sound policy to treat arbitration outcomes differently from litigation judgments or settlement agreements for reinsurance purposes. Accordingly, the fact that the insurer and its insured agreed to arbitrate disputes after the reinsurance certificate was issued cannot suspend operation of the "following forms" clause in the certificate.[36] We also disagree with the district court's conclusion that the arbitrator did not rely on the

(..continued)
River's payment of defense costs under the "follow the fortunes" clause, we need not decide whether the reinsurer is also bound by the "following forms" clause. Accordingly, we will not address the merits of the district court's "following forms" analysis.

In disposing of the summary judgment motions, the district court also rejected North River's arguments of waiver and estoppel. Because North River has not appealed those decisions, we will not review them.

[35]. See, e.g., Progressive Casualty Ins. Co. v. C.A. Reaseguradora Nacional de Venezuela, 991 F.2d 42, 45 (2d Cir. 1993) ("Federal policy, as embodied in the Federal Arbitration Act, strongly favors arbitration as an alternative dispute resolution process."); Nationwide Gen. Ins. Co. v. Investors Ins. Co. of America, 332 N.E.2d 333, 335 (N.Y. 1975) ("It is always useful to bear in mind that the announced policy of this State favors and encourages arbitration as a means of conserving the time and resources of the courts and the contracting parties.").

[36]. The district court's reliance on Unigard III is misplaced. The court cited Unigard III's holding that an arbitration result did not alter the terms of the bargained for agreement. North River, 831 F. Supp. at 1150 (citing Unigard III, 4 F.3d at 1071). But that language referred only to the narrow question of whether the reinsurer was liable to follow the arbitrator's decision ordering payments that exceeded express limits of the reinsurance certificate. The Second Circuit held that the arbitrator's decision could not nullify express limits written into the reinsurance certificate, but the court did not say that the arbitrator's interpretation of the agreement was otherwise without effect. Unigard III, 4 F.3d at 1071.

underlying policies in ordering coverage of Owens-Corning's defense costs. As noted, see part III.C. supra, the arbitrator analyzed the underlying policy at length and concluded that it did not exclude coverage of defense costs.

VI.

CIGNA Re cross-appeals the district court's denial of its motion for reconsideration of the court's order to include, as an alternative basis for summary judgment, that the reinsurance certificates cap CIGNA Re's liability to the limit stated in the certificates.[37] Throughout the district court proceedings CIGNA Re repeatedly disavowed this argument. The district court issued its summary judgment order without addressing the limits issue because it found, "CIGNA Re has never raised this defense." North River, 831 F. Supp. at 1142. CIGNA Re then filed a motion for reconsideration under Federal Rule of Civil Procedure 59(e), which provides, "A motion to alter or amend the judgment shall be served not later than 10 days after entry of the judgment."[38]

---

[37]. At the same time that it filed its motion for reconsideration, CIGNA Re also filed a motion to amend judgment because of errors. The district court corrected the errors, but denied the motion for reconsideration.

[38]. CIGNA Re also sought reargument under Rule 12(I) of the General Rules of the United States District Court for the District of New Jersey, which provides,

> A motion for reargument shall be served and filed within 10 days after the entry of the order or judgment on the original motion by the Judge or Magistrate Judge. There shall be served with the notice a brief setting forth concisely the matters or controlling

A proper motion to alter or amend judgment "must rely on one of three major grounds: `(1) an intervening change in controlling law; (2) the availability of new evidence [not available previously]; [or] (3) the need to correct clear error [of law] or prevent manifest injustice.'" Natural Resources Defense Council v. United States Envtl. Protection Agency, 705 F. Supp. 698, 702 (D.D.C.) (quoting All Hawaii Tours, Corp. v. Polynesian Cultural Ctr., 116 F.R.D. 645, 649 (D. Haw. 1987), rev'd on other grounds, 855 F.2d 860 (9th Cir. 1988)), vacated on other grounds, 707 F. Supp. 3 (D.D.C. 1989). CIGNA Re contended Unigard III presented an intervening change in controlling law, but the district court denied the motion. North River Ins. Co. v. Philadelphia Reinsurance, No. 91-1323, slip op. at 6-7. (D.N.J. November 15, 1993).

Generally, the denial of a motion for reconsideration is reviewed for an abuse of discretion. Koshatka v. Philadelphia Newspapers, Inc., 762 F.2d 329, 333 (3d Cir. 1985). However, "[b]ecause an appeal from a denial of a Motion for Reconsideration brings up the underlying judgment for review, the standard of review varies with the nature of the underlying judgment." McAlister v. Sentry Ins. Co., 958 F.2d 550, 552-53 (3d Cir. 1992) (citing Federal Kemper Ins. Co. v. Rauscher, 807

(..continued)
        decisions which counsel believes the Judge or
        Magistrate Judge has overlooked. No oral
        argument shall be heard unless the Judge or
        Magistrate Judge grants the motion and
        specifically directs that the matter shall be
        reargued orally.

F.2d 345, 348-49 (3d Cir. 1986)). Where there is a mixed question of law and fact, "the reviewing court should separate the issue into its respective parts, applying the clearly erroneous test to the factual component, the plenary standard to the legal." Ram Constr. Co. v. American States Ins. Co., 749 F.2d 1049, 1053 (3d Cir. 1984).

CIGNA Re's appeal of the denial of its motion raises two issues: first, whether the district court properly found that CIGNA Re had failed to raise the indemnity limits defense; and second, whether, despite a failure to raise the defense, the Second Circuit's decision in Unigard III represented an intervening change in controlling law sufficient to warrant grant of a motion for reconsideration. We will apply a "clearly erroneous" standard to the first question and plenary review to the second.[39]

In March, 1992, CIGNA Re urged the district court to deny North River discovery on the indemnity cap issue, saying, "We are not defending this case on that basis." App. at 1011. Thereafter, while it was considering the summary judgment

---

[39]. In conducting plenary review over the second question, however, we are mindful that ordinarily, under law of the case doctrine, we will "refuse to consider issues that are raised for the first time on appeal." Salvation Army v. New Jersey Dep't of Community Affairs, 919 F.2d 183, 196 (3d Cir. 1990) (quoting Newark Morning Ledger Co. v. United States, 539 F.2d 929, 932 (3d Cir. 1976)). Nevertheless, where "a previously ignored legal theory takes on new importance due to an intervening development in the law, it is appropriate . . . to exercise . . . discretion to allow a party to revive that theory." Id. We note that this standard is substantially the same as that governing disposition of a motion for reconsideration.

motions, the district court invited CIGNA Re to address this issue.  Nevertheless, CIGNA Re declined.  In a letter to the district court, dated September 9, 1993, (which was eleven days before the summary judgment opinion was filed), CIGNA Re wrote:

> CIGNA Re does <u>not</u> take the position that it could never have an obligation in excess of its certificate limits.  According to industry practice, and according to the law as CIGNA Re understands it . . ., CIGNA Re <u>could</u> have an obligation for expense in excess of its certificate limits —— <u>if</u> the reinsured policy, when issued, had an obligation to pay defense [costs] in excess of <u>its</u> limit.  The contractual problem in this case is not the certificate limits <u>per se</u>, but rather the fact that the policies <u>as originally issued and reinsured</u> had no defense obligation.

(Letter from Thomas A. Allen to the district court of Sept. 9, 1993, at 1-2), <u>reprinted in</u> app. at 934-35.

Later, in the course of a September 16, 1993, conference call, CIGNA Re advised the court that it was considering applying for leave to raise the defense after all, in light of the Second Circuit's decision in <u>Unigard III</u>.  The district court, however, informed counsel that it was not going to entertain further briefing and issued its summary judgment order on September 20, 1993, without addressing the indemnity limits issue.  Because the record supports the court's conclusion that CIGNA Re failed to raise the indemnity cap defense, it was not "clearly erroneous" and we will affirm the finding.

CIGNA Re also argues that the Second Circuit's decision in <u>Unigard III</u> represents an intervening change in controlling law, warranting reconsideration of the district court's summary

judgment. See Natural Resources Defense Council, 705 F. Supp. at 702. CIGNA Re explains that it failed to raise the indemnity limits defense because it believed Bellefonte Reinsurance Co. v. Aetna Casualty & Surety Co., 903 F.2d 910 (2d Cir. 1990), in which the Court of Appeals for the Second Circuit held the reinsurer not liable for defense costs above caps stated in the reinsurance certificates, would be limited to its specific facts. CIGNA Re then vaults its analysis into a rule of law, asserting that without Unigard III, Bellefonte would have been so limited. We do not find that Unigard III represents a significant development from the Bellefonte rule.

In Bellefonte, A.H. Robbins Co. had sued its primary and excess insurer, Aetna, for defense costs Robbins incurred defending against personal injury claims involving the Dalkon Shield intra-uterine device. After Aetna settled the litigation for an amount "substantially in excess" of the cap stated in its policies, Aetna sought indemnity from its reinsurers for a portion of the overage. Bellefonte, 903 F.2d at 911. The reinsurers agreed to indemnify Aetna to the limit stated in their reinsurance certificates, but refused to pay any additional costs. Id.

After the reinsurers sought a declaratory judgment limiting their liability, Aetna counterclaimed for a declaratory judgment that its reinsurers had to "follow the fortunes" and cover all costs. The district court awarded summary judgment to the six reinsurers. Thus, the issue on appeal was "whether the reinsurers [were] obligated to Aetna for an amount greater than

the amounts stated in the reinsurance certificates." Id. at 912.
The Court of Appeals for the Second Circuit held that "follow the
fortunes" doctrine could not override a reinsurance certificate's
express indemnity limit, reasoning that to do so "would strip the
limitation clause and other conditions of all meaning; the
reinsurer would be obliged merely to reimburse the insurer for
any and all funds paid." Id. at 913.

CIGNA Re rejected the indemnity cap theory throughout
discovery because, it claims, it reasonably believed courts would
restrict Bellefonte to its unique facts. But the Second Circuit
did not indicate that Bellefonte would be limited to its facts.
And, of course, subsequently, in Unigard III, that court did not
limit Bellefonte. In Unigard III, the Second Circuit considered
a "follow the fortunes" clause virtually identical to that in
Bellefonte. What is especially significant is that the court
expressly adopted the reasoning of Bellefonte, holding, "'[T]he
limitation on liability provision capped the reinsurers'
liability under the [Certificate]. All other contractual
language must be construed in light of that cap.'" Unigard III,
4 F.3d at 1071 (quoting Bellefonte, 903 F.2d at 914).

Clearly, CIGNA Re's restrictive view of Bellefonte is
not dispositive here. In Salvation Army v. New Jersey Dep't of
Community Affairs, 919 F.2d 183, 196 (3d Cir. 1990), this court
considered a claim raised for the first time on appeal because,
without the teaching of the intervening case, the party had been
"quite reasonable in believing" the new claim would have added
little to its cause. But we cannot say that CIGNA Re was "quite

reasonable in believing" that it could not rely on <u>Bellefonte</u> on this issue.[40]  Thus, contrary to CIGNA Re's claim that <u>Unigard III</u> is a significant development in reinsurance law, we find the decision expressly follows <u>Bellefonte</u>.  Accordingly, we deny CIGNA Re's request that the merits of its certificate limits defense be addressed.

VII.

For the foregoing reasons, we will reverse the summary judgment granted to CIGNA Re.  We cannot say that defense costs were outside the scope of coverage provided under the reinsurance certificates and we will not relieve CIGNA Re of its obligation to "follow the fortunes" of North River on that basis.  We will reverse the district court's finding that North River, as a matter of law, violated its duty of good faith to CIGNA Re.  And we will reverse the denial of summary judgment to North River on all points except whether North River, by failing to schedule its policies and by rejecting the settlement proposal, breached its duty of good faith to CIGNA Re.  We will affirm the district court's denial of CIGNA Re's motion for reconsideration.

---

[40].  To bolster its theory that before <u>Unigard III</u> other courts would have restricted <u>Bellefonte</u> to its facts, CIGNA Re cites an article by Deborah Cohen, Aetna's attorney in <u>Bellefonte</u>.  <u>See</u> Deborah F. Cohen, <u>The Bellefonte Decision and the "Follow the Fortunes" Doctrine</u>, Mealey's Litigation Reports (Reinsurance), Dec. 6, 1990, at 24, 29.  Although the article makes a case for limiting <u>Bellefonte</u>, we do not find that it was "quite reasonable" for a party to rely on the writings of an interested attorney in light of the clear language of <u>Bellefonte</u>.