**NEWARK MORNING LEDGER COMPANY, a corporation of the State of New Jersey**

v.

**The UNITED STATES of America, Appellant.**

No. 75–2192.

United States Court of Appeals, Third Circuit.

Argued April 8, 1976.

Decided June 29, 1976.

Jonathan S. Cohen, Scott P. Crampton, Asst. Atty. Gen., Gilbert E. Andrews, Chief, Appellate Section, Tax Div., Dept. of Justice, Washington, D. C., for defendant-appellant.

Donald A. Robinson, Robinson, Wayne & Greenberg, Newark, New Jersey, John R. Coughlin, Sabin, Bermant & Blau, New York City, for plaintiff-appellee.

Before CLARK,* Associate Justice, and GIBBONS and HUNTER, Circuit Judges.

## OPINION OF THE COURT

Mr. Justice CLARK:

This appeal, brought under 28 U.S.C. § 1291, tests the validity of a refund of federal income taxes ordered by the District Court covering legal expenses incurred by the Newark Morning Ledger Company (Ledger) in protracted litigation with the Republican Company (Republican), in which Ledger, as a stockholder, complained of malfeasance by Republican's management. The facts were stipulated, cross motions for summary judgment were filed, and the court ordered the refund to be paid. The Government raises two points here: (1) the expenses incurred by Ledger were for the benefit of Republican, and thus were not

---

* The Hon. Tom C. Clark, Associate Justice, Retired, sitting by designation.

deductible by Ledger; and (2) the expenses were capital, arising from the acquisition of its interest in Republican, and therefore, they are not deductible as ordinary expenses incurred in carrying on its trade and business.[1] We affirm the judgment.

### 1. *The Facts:*

The facts are stipulated and can be stated concisely.[2] In June, 1960, prior to the purchase by Ledger, the stock of Republican was held as follows: 23 shares by trustees of Republican's employee pension funds (Funds), 80 shares by the immediate family of Sherman Bowles, the deceased publisher of Republican (Family), and 74 shares by certain cousins of Bowles (Cousins). There was also outstanding a 15-year voting trust agreement, initiated in 1952 between the Funds and the Family, vesting control of Republican and its subsidiaries in the trustees of the Funds.

On June 6, 1960, Ledger purchased the 74 shares of the Cousins for $1,850,000. On June 17, 1960, Ledger entered into an escrow agreement to purchase the 80 shares of the Family upon the termination of the 1952 voting trust; under the terms of the agreement, the purchase price of $1,650,000 for the Family's shares was deposited in a Boston bank. Soon after this purchase of 87% of the beneficial ownership of the stock of Republican, Samuel I. Newhouse, the president of Ledger,[3] telephoned Sidney Cook, an officer of Republican, and advised him of the purchase, and they agreed to meet the next day in New Haven, Connecticut, to discuss the same. After this meeting, Newhouse requested Cook to run a news story on the purchase, and this was done on the next day in one of the Republican newspapers. On the next Sunday, a critical editorial appeared on the first page of the Republican's Sunday newspaper, decrying its purchase by "outside interests." On the following day, Newhouse contacted Cook and indicated that he was coming to Springfield to talk over the matter, but Cook thought this unwise and it was agreed that they meet in New York City the next day. At this meeting, Cook suggested that Ledger sell its newly acquired stock, but Newhouse indicated that it was not for sale and again requested an opportunity to inspect the plant of Republican at an early date. However, Cook delayed the request, and no inspection was ever held. Ledger then sought a financial statement of Republican which was refused, and later a request for examination of its books and records suffered the same treatment.

This conduct by Republican's management, officers appointed by the trustees of the Funds, triggered the filing of six lawsuits, two in the federal court (one of which was dismissed on jurisdictional grounds) and four in the Superior Court of Massachusetts. Two of the cases were specifically denominated shareholder derivative suits. In substance, the litigation asserted mismanagement of Republican, alleged breaches of fiduciary duty and diversion of corporate assets into the employees pension funds, sought indemnification for Republican, and demanded the removal of the Funds' trustees and the appointment of substitutes. The state cases were consolidated on February 23, 1961 and referred to a master-auditor. Hearings were held for 117 trial days, and on April 22, 1964, the master filed his report with the Superior Court, which later approved the report and its findings with some modification. The hearing on a Final Decree was held in the Superior Court, but on March 26, 1966, a final decree judgment embodying a judg-

---

1. At trial, the Government pressed "most emphatically" the question whether Ledger was in the business of owning stock in newspaper publishing companies. Apparently the frivolity of this claim is so obvious and the treatment of it by the trial court so devastating that the Government abandons it here.

2. The stipulation includes both a Section II, applicable to the Government, and a Section

III, applicable to Ledger, which relate statements of facts to which the respective parties did not agree. See pp. 11–14 of the Joint Appendix on appeal.

3. The Ledger is a wholly owned subsidiary of Advance Publications, Inc., which in turn is controlled by Newhouse.

ment of dismissal was entered as a result of a settlement agreement. The settlement decree required the trustees of the Funds to surrender all of the Funds' shares of stock to Republican and forego past and future obligations of Republican for contributions to the Funds, except when approved by Republican's Board of Directors. The second federal suit had been held in abeyance awaiting the state cases. However, a Master had been appointed in 1964, and he had held 75 days of hearings. The state suit settlement carried with it an agreement to dismiss the federal suit. The terms of the settlement did not provide for Ledger's costs and attorneys' fees incurred in the litigation.

The Ledger's fees and expenses in the litigation were $478,472.52 covering the years 1963–1967, and it claimed tax deductions in each of those years in which the expenses were incurred. The Internal Revenue Service, however, assessed tax deficiencies against Ledger for these deductions. The deficiencies totaled $295,421.40, plus interest. Ledger paid the assessed deficiencies and filed timely suit for refund. The district court rendered judgment against the Government for the amount of the deficiencies levied and paid, with interest and costs, but exclusive of attorneys' fees for the refund suit.

2. *The Points on Appeal:*

■ (a) As we have noted, the Government alleges first that the expenses claimed here were incurred by Ledger for the benefit of Republican, rather than Ledger, and as a matter of law were thus non-deductible under I.R.C. Section 162, 26 U.S.C. § 162. In response to Ledger's contention that this issue is being raised for the first time on appeal, the Government points to a trial memorandum as supporting its claim that the point was raised in the trial court. Examination of the reference [4] reveals clearly, however, that the argument was made to support the theory that the expenditure was a capital one, and not the theory that it was made for the benefit of Republican. We generally refuse to consider issues that are raised for the first time on appeal. *Sachanko v. Gill*, 388 F.2d 859, 861 (3d Cir. 1968); *Tromza v. Tecumseh Products Co.*, 378 F.2d 601, 604 (3d Cir. 1967); *Mirkowicz v. Reading Co.*, 84 F.2d 537, 538 (3d Cir. 1936). We are familiar with the position of the Supreme Court that in horrendous cases where a gross miscarriage of justice would occur, the practice should be relaxed. *Hormel v. Helvering*, 312 U.S. 552, 61 S.Ct. 719, 85 L.Ed. 1037 (1940). But this is not such a case. Not only did the Government, in pursuing its summary judgment, fail to raise the new theory it now proposes, but it also failed to raise it in defense of the taxpayer's motion for summary judgment. Although the general rule is that cross-motions for summary judgment do not constitute an agreement that if one is rejected the other is warranted, *Rains v. Cascade Industries, Inc.*, 402 F.2d 241, 245 (3d Cir. 1968), the filing of a motion for summary judgment does not relieve a party of his responsibility to uphold his burden in opposition to the other party's motion. Had the

4. The portion to which our attention is directed is as follows:

Even if the "origin" test had not provided the answer to the question, another doctrine would similarly show that the expenditures in issue should be capitalized. The suits brought by, or caused to be brought by, plaintiff were in substance stockholder's derivative actions, in which there was sought the return of allegedly illegally diverted corporate assets. Had those assets been sought directly by Republican there can be no question that the cost of reacquiring them would have had to be capitalized. Here that cost was incurred by Republican's shareholder in derivative actions and similarly those costs must be capitalized and the plaintiff's expenditure treated as an additional contribution by it to the capital of Republican. The direct effect on the shareholder of derivatively asserting the corporation's right to title of corporate assets is to enchance (sic) the value of its stock interest by increasing the amount of the corporate assets. Clearly such enhancement is a betterment and by virtue of Section 263 and the Regulations thereunder the expenses should have been capitalized and not expensed currently.

In conclusion, it is clear on the undisputed facts that, under either the origin test or the capital contribution theory, the expenditures by the plaintiff are not currently deductible but must be capitalized. (Trial brief at 22–23).

new theory been raised below, Ledger would have put into issue facts that it asserts would show that the litigation was in fact filed to aid Ledger in the protection of its investment, and not brought for Republican's benefit. Such facts might have precluded summary judgment, but since the questions were not raised in the district court, they cannot be presented or considered on appeal. See *Shafer v. Reo Motors, Inc.*, 205 F.2d 685 (3d Cir. 1953).

Moreover, one of the factors considered in *Hormel* was the certainty of the taxpayer's liability had the correct theory been argued by the Government in the district court. This case plainly presents the opposite situation, for there is no certainty of establishing Ledger's liability by the theory now advanced by the Government. There is no *per se* rule that the expenses of a shareholder's derivative suit are never deductible. Indeed, the Government admits that the corporation itself could deduct these expenses, Appellant's Reply Brief pp. 5–6 at note 3, and the general rule is that expenses of shareholders in successful derivative suits are chargeable to the corporation itself. 13 W. Fletcher, Cyclopedia of Law of Private Corporations § 6044 (rev. ed. 1970). The Government was required to make its case below. Had it met that obligation, Ledger and the district court could have addressed the new theory and created a more complete record on appeal. We see no injustice in holding the Government to the arguments it made below and consider the greater equities to be with Ledger.

But even if our decision on this point is not sustainable, it does not follow that the Government must prevail. The Tax Court has suggested that a shareholder can deduct the fees and expenses of a derivative suit from gross income. *Shoe Corporation of America v. Commissioner*, 29 T.C. 297, 307 (1957). In addition, the Government urged the same theory raised here in at least one other case, *Brown v. United States*, 526 F.2d 135 (6th Cir. 1975), but

there the court sidestepped the question. In the face of the record here and only in the event we are wrong in refusing to decide the question, we hold that Ledger may deduct its expenses and costs incurred in preventing the looting of the corporation because the litigation was not for Republican's benefit. The niceties of corporate law not applicable to tax realities should not deprive Ledger of recoupment of its expenses under the peculiar facts here.

The expenditures here, although incurred in derivative suits, are deductible by Ledger. An exception to the general rule has been carved out allowing deductions for expenditures made by a taxpayer to protect or promote his own business even though the transaction occasioning the expenditure originated with someone else and would have been a deductible item if it had been paid by the latter. *Bordo Products Co. v. United States*, 476 F.2d 1312, 201 Ct.Cl. 482 (1973); *Young & Rubicam, Inc. v. United States*, 410 F.2d 1233, 1238–39, 187 Ct.Cl. 635 (1969); *Wells-Lee v. C. I. R.*, 360 F.2d 665 (8th Cir. 1966); *Dunn & McCarthy Inc. v. C. I. R.*, 139 F.2d 242 (2d Cir. 1943).

In *James L. Lohrke*, 48 T.C. 679 (1967), the Tax Court announced a two-prong test; (1) Is the purpose or motive which causes the taxpayer to pay the obligations of the other entity to protect or promote its own business; and (2) Is it an ordinary and necessary expense of taxpayer's business, *supra* at 688. Here Ledger meets both these tests.[5] A successful derivative suit to recover allegedly stolen earnings, as here, is an assumption of the corporation's obligations to protect the shareholder's investment. Here, the investment in another newspaper company was Ledger's business and the litigation expenses were incurred as part of that business. It is analogous reasoning which requires the award of costs and attorneys' fees to the shareholder bringing the successful derivative suit and then allows those expenses to

5. Of course, a third and independent test, whether the expense is a capital outlay, must be met. That issue forms the second part of the Government's case on appeal and is addressed later in this opinion, *infra* this page.

be deducted by the corporation, e. g. *Shoe Corporation of America v. Commissioner*, 29 T.C. 297, 307 (1957). The fact that the suit results in a settlement does not change the rule. *Charles Kay Bishop*, 25 T.C. 969, 973 (1956). It is true that in Ledger's settlement there was no order directing Republican to pay the expenditures, but the rule is reasonably applied here. Had Republican paid the Ledger's expenses, there would be no question regarding Republican's right to deduct the payment. Ledger incurred the obligations of Republican in the derivative suit to protect Ledger; the costs and attorneys' fees of the suit should be deductible to Ledger.

(b) We now turn to the Government's second point: Ledger's litigation expenses are capital expenditures arising from the acquisition of its interest in Republican. *Woodward v. Commissioner of Internal Revenue*, 397 U.S. 572, 90 S.Ct. 1302, 25 L.Ed.2d 577 (1970) places this claim to rest. In announcing the "origin and nature" test, the Supreme Court limited the category of controlling facts to "objective" rather than "subjective" ones. The question to be determined is the origin and nature of the litigation expenses. Here, as the trial court found, the lawsuits filed by Ledger asserted that the fund trustees were siphoning off the earnings of the newspapers to the pension fund and themselves. There was no dispute over the ownership of Ledger, nor over the agreement between it and the Bowles Cousins and Family; there was no attempt to accelerate the 1952 Voting Trust Agreement, or to dissolve it and thereby advance Ledger's control. The Government concedes all this. The record shows that the Ledger preferred that Republican remain in the control of local people. The origin of the litigation was to prevent destruction of assets rather than gain benefits. Moreover, the trouble all began after Ledger had purchased the stock and found out definitely that it had bought a hornets' nest, with a management bent upon stinging Ledger out of its three and one-half million dollar investment. All Ledger wanted was to stop the theft of its earnings. Neither the price it paid nor the value it received when purchasing Republican was in question. It was those factors of price and value which fixed the origin of the litigation in *Brown v. United States*, 526 F.2d 135 (6th Cir. 1975), and required that the expenses be capitalized because they were part of a planned disposition of a capital asset. This case is easily distinguished from *Brown* and *Woodward's* other progeny.[6]

■■■ We need not inquire further since the stipulated facts speak for themselves. The district court concluded that Newhouse's knowledge was not a fact in

---

**6.** *Woodward's* "origin of the claim" test formalized the Supreme Court's earlier holding in *United States v. Gilmore*, 372 U.S. 39, 83 S.Ct. 623, 9 L.Ed.2d 570 (1963). Gilmore was prevented from deducting the litigation expenses of his divorce because the origin of his claim was in the personal relationship of marriage. The fact that the outcome of his divorce affected his property holdings could not change the reality of the analysis that the origin of the litigation was not to protect property. Ledger's claim had such an origin.

Each of the cases pointed to by the Government can be distinguished in the same way. In *Helgerson v. United States*, 426 F.2d 1293 (8th Cir. 1970), the origin of the litigation was the dispositive transaction in which the dispute over the security interest in the stock took place. In *Munn v. United States*, 455 F.2d 1028 (Ct.Cl.1972), the beneficiary's suit to secure more income from his trust was made in the contextual framework of the trust's disposition of major stock holdings. In *Brown, supra*, 526 F.2d 135 (1975), the taxpayer originally sought legal assistance in order to assess the value of her stock in response to her brother's offer to buy. Finally, in the recent case of *Estate of Richard Baier v. Commissioner of Internal Revenue*, 533 F.2d 117 (3rd Cir. 1976), this Circuit ruled that litigation over the size of payments to be made on the assignment of Baier's patent had the disposition of the patent as its origin; the expenses of the suit could not be deducted. Although Ledger's litigation came soon after its acquisition of Republican, the Government has failed to establish a nexus between the litigation and the acquisition. The aforementioned cases all recite price, time of payment, security for the sale, or method of treatment of the proceeds of a sale as the connection that placed the litigation as part and parcel of the acquisition or disposition process. No similar connection exists between Ledger's acquisition and its litigation.

dispute essential to deciding the case. Intent or motive is irrelevant under the "origin of the claim" test. The origin of the litigation was the protection of Ledger's investment from the "siphoning" of "earnings" by the trustees of the Funds. In short, the Government has wholly failed to demonstrate a nexus between the origin of the litigation and the acquisition of Republican; without facts to show that the litigation was an integral part of the purchase of the stock, the costs of that litigation were properly deductible under Section 162. Summary judgment was properly granted.

*Affirmed.*