December 13, 1995 UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT



No. 95-1313

ANDRE GRENIER,

Plaintiff - Appellant,

v.

CYANAMID PLASTICS, INC.,

Defendant - Appellee.



ERRATA SHEET ERRATA SHEET

The opinion of this Court issued on November 27, 1995, is
amended as follows:

1. On page 12, change footnote 3 to read: change 

Both parties refer us to this Guidance although it was
published after the decision by Cyro to reject Grenier's
application. We note that a revised version of the Guidance
was issued October 10, 1995, after oral argument in this
case. See Equal Employment Opportunity Comm'n, Enforcement 
Guidance: Pre-Employment Disability-Related Questions and 
Medical Examinations (Oct. 10, 1995) (reprinted in EEOC 
Compl. Man. (CCH) 6093, at 5371). 

2. On page 13, lines 2-3, delete this parenthetical: delete

(reprinted in EEOC Compl. Man. (CCH) 6903, at 5371, and in 
Americans with Disabilities Act Manual (BNA) No. 29) 

3. On page 22, end of 6th line from bottom, add "1st Cir." to add
parenthetical, so that it reads: 

(1st Cir. 1995)

4. On page 24, 5th line from bottom, end of parenthetical,
change "at 355" to "at 347-48". change

5. On page 25, end of line 4, insert a footnote: insert

On October 10, 1995, subsequent to oral argument, the EEOC
issued a new Guidance. Although neither party has argued
that we ought to consider this newest guidance, we note that

the EEOC has revised its interpretation of the ADA and now
reaches the same conclusion. Under a section headed "The
Pre-Offer Stage," the EEOC now explains:

However, when an employer could reasonably believe that
an applicant will need reasonable accommodation to
perform the functions of the job, the employer may ask
that applicant certain limited questions. 
Specifically, the employer may ask whether s/he needs 
reasonable accommodation and what type of reasonable 
accommodation would be needed to perform the functions 
of the job.

Enforcement Guidance: Pre-Employment Disability-Related 
Questions and Medical Examinations (Oct. 10, 1995) (emphasis 
in original).

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT


No. 95-1313

ANDRE GRENIER,

Plaintiff - Appellant,

v.

CYANAMID PLASTICS, INC.,

Defendant - Appellee.



APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge] 



Before

Selya and Boudin, Circuit Judges, 

and Saris,* District Judge. 



Roderick H. Potter, with whom Potter, Prescott, Jamieson & 
Nelson was on brief for appellant. 
Jerrol A. Crouter, with whom Christopher G. Jernigan and 
Drummond Woodsum & MacMahon were on brief for appellee. 



November 27, 1995


 

* Of the District of Massachusetts, sitting by designation.

SARIS, District Judge. Appellant Andre Grenier SARIS, District Judge. 

("Grenier") was employed as an electrician for Cyanamid Plastics,

Inc., d/b/a Cyro Industries ("Cyro"), for several years before he

was placed on disability leave due to psychological problems.

After his employment had officially terminated by automatic

operation of the company disability policy, but while still

receiving disability benefits, Grenier notified Cyro that he was

an individual with a disability who needed reasonable

accommodation to return to work and applied to be re-hired into

his previous position. Before making him a job offer, Cyro

requested Grenier to provide certification from his physician

stating that he was prepared to return to work without

restrictions or identifying the reasonable accommodations

necessary for him to return to work. When Grenier failed to do

so, his application was rejected. 

The difficult issue on appeal is whether Cyro violated

the Americans with Disabilities Act ("ADA"), 42 U.S.C. 

12112(d), which prohibits certain preemployment medical

examinations and inquiries of a job applicant. Concluding that

Cyro did not violate this provision of the ADA, we affirm the

district court's entry of summary judgment for Cyro.

I. STATEMENT OF THE CASE I. STATEMENT OF THE CASE 

A. Facts A. Facts

Reviewing the factual record in the light most

favorable to the nonmoving party, as we must at summary judgment,

see Mesnick v. General Elec. Co., 950 F.2d 816, 822 (1st Cir. 

-2-

1991), cert. denied, 504 U.S. 985 (1992), we treat the following 

facts as undisputed.

1. The Disability Leave 1. The Disability Leave

Andre Grenier worked as a shift electrician for Cyro at

its plant in Sanford, Maine, from 1980 to 1989. Grenier's

technical skill as an electrician was good. In 1989, Grenier and

several other employees were questioned about vandalism of plant

machinery that had occurred during their shift. Grenier

responded to the questioning "in a highly emotional and

irrational manner" and failed to report to his next scheduled

shift. He informed his supervisor, William Kennedy, that he was

afraid to be on a shift without an alibi, and that he was "losing

it." Stating that Grenier's behavior was "very disruptive and

potentially dangerous," Kennedy placed Grenier on medical leave

in November 1989. This leave was explicitly "until such a time

when you can be cleared by our medical department to return to

work." Kennedy informed Grenier in writing that in order to

return he would have to go through the standard reentry screening

process, including permitting his doctors to discuss the

specifics of his case with the company doctor. 

In August 1990, Grenier mailed the first of a series of

letters to Cyro, including a one-page letter received September

27, 1990, and a six-page "statement" of April 11, 1991. In these

letters, Grenier criticized the plant manager Skip Brogli and

complained that company actions in investigating vandalism at the

plant and placing him on medical leave had caused him to suffer

-3-

increased anxiety. He attacked several policies of the plant

that he claimed were a "constant source of aggravation" to him. 

He also discussed in detail various collateral issues, such as

the criminal charges faced by the son of a Cyro manager, a sexual

harassment investigation of a fellow employee, and various

transfers of Cyro managers.

Grenier informed Cyro in his letters that his analyst

Dr. Stewart "describes me as being Narcissistic," but noted that

"I prefer the word 'proud.'" He stated that "Dr. Stewart also

describes me as having 'somewhat paranoid beliefs concerning the

malevolent intent of the (relatively new) management.'" He also

noted that "[a]fter a year and a half of being unable to work, my

analyst feels that it would be in my best interests to quit my

job and find another . . . that I've become obsessed with this

Skip guy [manager Skip Brogli]." He stated repeatedly, however,

that he refused to quit his job.

"As a final note," wrote Grenier in one letter, dated

April 11, 1991, "I want to point that [sic], although Dr. Stewart

is indicating that he feels that I am not totally disabled, I

still feel convinced that I am." Grenier realized his statement

had "some strong elements of paranoia," but claimed that "the

paranoia is not just my own . . . it has become fairly rampant

throughout the workforce." And:

The continuing incidents of vandalism,
recently, should be a clear signal to
Corporate headquarters that Cyro Industries,
in Sanford, Me. is still more than just a
little bit sick.

-4-

There is still some hope, however, if only
the right steps are taken. And unless the
right steps are taken, somebody else is going
to be hurt, maybe even killed. Of that, I am
sure.

Grenier would not voluntarily terminate his employment.

He remained on indefinite disability leave until May 12, 1991,

when his employment at Cyro terminated automatically as a result

of the expiration of his continuous service credits. Cyro

informed Grenier of his termination by letter May 15, 1991.

Grenier received disability benefits from Cyro for a

two-year period ending December 31, 1992. Under the company's

plan, benefits were payable for up to two years if Grenier was

under the regular care of a licensed physician and unable to

perform the duties of his specific job, but benefits would have

continued beyond this period only if the Disability Department

determined that his medical condition prevented him "from working

at any job for which [he was] reasonably qualified to perform."

On December 4, 1992, the Cyro disability department wrote Grenier

that based on information received from an independent medical

examination of July 30, 1992, he was not disabled to this extent

and, therefore, no benefits were payable after January 1, 1993.

2. Application for Re-Employment 2. Application for Re-Employment

In a letter dated December 18, 1992, and addressed to

Robert Lysaght, the Personnel Operations Manager at the Sanford

plant, Grenier asked to be considered an applicant for the job of

shift electrician, his former position. Grenier was still

receiving disability benefits at this time. In this letter,

-5-

which was under the heading "request for employment

accommodation," Grenier stated:

I qualify as an individual with a disability
as defined by Federal and State Civil Rights
laws.

I understand that CYRO Industries is
conducting interviews for the position of
shift mechanic in the electrical department.
The purpose of this letter is to request
accommodation to return to work in the same
capacity as I had been working since
September of 1980.

. . .

I believe that I should be afforded the
opportunity to be accommodated to return to
my job, at the very least, for a trial
period, to prove that I am able to perform my
job.

I believe that, under reasonable
circumstances, I should be able to perform in
a safe and reliable manner.

In response, Lysaght told Grenier in a January 5, 1993,

letter that "CYRO is not currently accepting applications" but

that the Maine unemployment office would be notified when Cyro

was soliciting applications. In reality, a job notice was posted

on January 4, 1993 -- subsequent to Grenier's request for

consideration as an applicant, but prior to the date of Lysaght's

response. Lysaght requested in his letter:

Since your termination of employment came as
a result of the expiration of Continuous
Service Credits while you were on an extended
medical leave, CYRO would reasonably request
that you provide us with certification from a
physician that you are prepared to return to
work without restrictions or identifying any
accommodations that are required for you to
return to work at the Sanford location. Of
course, any requests for employment

-6-

accommodation will be considered with regard
to the reasonableness at the time of the
employment interview process.

Therefore, in order to return to work with
CYRO Industries you need 1) keep in touch
with the Maine Unemployment office in Sanford
to learn when CYRO is accepting employment
applications; 2) complete an employment
application for a position for which you are
qualified; and 3) provide CYRO with notice
from your physician that you are prepared to
return to work without restrictions or
identifying those reasonable accommodations
that may be necessary.

By letter of January 15, 1993, Grenier forwarded his

therapist's certification that he was disabled and requested to

discuss accommodation with Cyro Vice President William Loman. He

also maintained that his employment had never terminated, and

argued that the May 15, 1991, letter that informed him of the

termination "simply implies that my employment is terminated."

Cyro's New Jersey-based Personnel Director Thomas Ayres

responded by letter of January 25th by informing Grenier that he

must follow the steps outlined in Lysaght's January 5th letter in

order to be considered for employment.

Additional correspondence ensued. Grenier asserted

that he was "capable of performing the essential functions of the

job with or without accommodation" but failed to describe how he

would perform and refused to provide medical documentation. Cyro

continued to request the documentation.

On February 22, 1993, Cyro mailed Grenier an employment

application, which Grenier promptly returned. By letter of

March 15, 1993, Cyro rejected Grenier's application for

-7-

employment, stating that, "[a]fter careful review of all relevant

information, your request for employment consideration is

denied." 

B. Proceedings Below B. Proceedings Below

Grenier filed a two-count complaint in the District of

Maine on June 23, 1994, claiming that Cyro violated the ADA and

the Maine Human Rights Act, 5 M.R.S.A. 4551 et seq.1 Cyro 

filed a motion for summary judgment on the issue of pre-offer

inquiries, and Grenier opposed the motion on the same grounds.

The District Court entered summary judgment for Cyro. Grenier

argues on appeal that Cyro's pre-offer inquiry violated the ADA

and that there are genuine issues of material fact with respect

to his claim that Cyro's failure to hire him constituted

intentional discrimination.

II. ANALYSIS II. ANALYSIS 

A. Standard of Review A. Standard of Review

This court reviews the district court's grant of

summary judgment de novo. The standard of review has been 

clearly articulated by this court as follows:

Since appellate review of a grant of summary
judgment is plenary, the court of appeals,
like the district court, "must view the
entire record in the light most hospitable to
the party opposing summary judgment,
indulging all reasonable inferences in that
party's favor." An appellate panel is not
restricted to the district court's reasoning
but can affirm a summary judgment on any
independently sufficient ground. In the end,
 

1 As the parties acknowledge that federal law controls
construction of the state claim, we do not discuss it separately.

-8-

the entry of summary judgment can be upheld
only if "the pleadings, depositions, answers
to interrogatories, and admissions on file,
together with the affidavits, if any, show
that there is no genuine issue as to any
material fact and that the moving party is
entitled to a judgment as a matter of law.

Mesnick v. General Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) 

(citations omitted), cert. denied, 504 U.S. 985 (1992). 

B. Statutory Framework B. Statutory Framework

A close analysis of the statutory and regulatory

framework is essential to determine the employer's obligations

under the ADA when dealing with the known disability of a job

applicant.

1. The Statute  1. The Statute 

The ADA, 42 U.S.C. 12101 et seq., was enacted "to 

provide a clear and comprehensive national mandate for the

elimination of discrimination against individuals with

disabilities." 42 U.S.C. 12101(b). In the context of

employment, the ADA provides:

(a) General rule. No covered entity shall General rule.
discriminate against a qualified individual
with a disability because of the disability
of such individual in regard to job
application procedures, the hiring,
advancement, or discharge of employees,
employee compensation, job training, and
other terms, conditions, and privileges of
employment.

42 U.S.C. 12112(a).

With regard to medical examinations and inquiries, the

ADA sets up separate rules for pre-offer job applications,

12112(d)(2); post-offer pre-employment examinations,

-9-

12112(d)(3); and inquiries of current employees, 12112(d)(4).

Section 12112(d) provides as follows:

(d) Medical examinations and inquiries. 
(1) In general. The prohibition against
discrimination as referred to in [ 12112(a)]
shall include medical examinations and
inquiries.

(2) Preemployment.

(A) Prohibited examination or inquiry. Except
as provided in paragraph (3), a covered
entity shall not conduct a medical
examination or make inquiries of a job
applicant as to whether such applicant is
an individual with a disability or as to
the nature or severity of such disability.

(B) Acceptable inquiry. A covered entity may
make preemployment inquiries into the
ability of an applicant to perform job-
related functions.

Pursuant to paragraph (3), an employer may "require a medical

examination after an offer of employment has been made to a job

applicant and prior to the commencement of employment duties, and

may condition an offer of employment on the results of such

examination" only in certain circumstances.2 Once an applicant

 

2 This section provides in relevant part:

(3) Employment entrance examination. A covered
entity may require a medical examination after
an offer of employment has been made to a job
applicant and prior to the commencement of
employment duties of such applicant, and may
condition an offer of employment on the results
of such examination, 
if --

(A) all entering employees are subjected to
such an examination regardless of
disability;

-10-

becomes an employee, an employer is prohibited from requiring a

medical examination or making inquiries of an employee as to

whether he is an "individual with a disability or as to the

nature or severity of the disability unless such examination or

inquiry is shown to be job-related and consistent with business

necessity." 12112(d)(4). An employer may make "inquiries into

the ability of an employee to perform job-related functions." 

12112(d)(4)(B).

2. The Regulations 2. The Regulations

The regulations adopted under the ADA by the Equal

Employment Opportunity Commission ("EEOC") provide that an

employer may make "pre-employment inquiries into the ability of

an applicant to perform job-related functions, and/or may ask an

applicant to describe or to demonstrate how, with or without

reasonable accommodation, the applicant will be able to perform

job-related functions." 29 C.F.R. 1630.14(a). The EEOC

crafted 1630.14(a) in response to comments on the proposed

regulation from employers asking "whether an employer may ask how

an individual will perform a job function when the individual's

known disability appears to interfere with or prevent performance

of job-related functions." 56 Fed. Reg. 35725, 35732 (1991).

The EEOC published as an appendix to the regulations a

section-by-section "Interpretive Guidance on Title I of the
 

(B) information obtained [is kept confidential,
with limited exceptions]; and

(C) the results of such examination are used
only in accordance with this subchapter.

-11-

Americans with Disabilities Act." 29 C.F.R. Pt. 1630, App. We

have looked to this source in interpreting the ADA. See Carparts 

Distrib. Ctr., Inc. v. Automobile Wholesaler's Ass'n, 37 F.3d 12, 

16 (1st Cir. 1994). Such administrative interpretations of the

Act by the enforcing agency, "while not controlling upon the

courts by reason of their authority, do constitute a body of

experience and informed judgment to which courts and litigants

may properly resort for guidance." Meritor Sav. Bank, FSB v. 

Vinson, 477 U.S. 57, 65 (1986). 

The EEOC explains the regulation 1630.14(a) as

follows:

An employer may also ask an applicant to
describe or to demonstrate how, with or
without reasonable accommodation, the
applicant will be able to perform job-related
functions. Such a request may be made of all
applicants in the same job category
regardless of disability. Such a request may
also be made of an applicant whose known
disability may interfere with or prevent the
performance of a job-related function,
whether or not the employer routinely makes
such a request of all applicants in the job
category. For example, an employer may ask
an individual with one leg who applies for a
position as a home washing machine repairman
to demonstrate or to explain how, with or
without accommodation, he would be able to
transport himself and his tools down the
basement stairs. However, the employer may
not inquire as to the nature or severity of
the disability. Therefore, for example, the
employer cannot ask how the individual lost
the leg or whether the loss of the leg is
indicative of an underlying impairment.

3. The Guidance 3. The Guidance

-12-

An EEOC Enforcement Guidance, dated May 19, 1994,3

further aids our interpretation of the rules concerning pre-offer

inquiries of applicants with known disabilities. See Equal 

Employment Opportunity Comm'n, Enforcement Guidance: 

Preemployment Disability-Related Inquiries and Medical 

Examinations Under the Americans with Disabilities Act of 1990 

(EEOC Notice 915.002) (May 19, 1994) [hereinafter Guidance]. The 

Guidance was designed "for interim use by EEOC investigators,

pending coordination with other federal agencies." Id., Exec. 

Summ. It is not binding law, but as a detailed analysis of the

relevant ADA provisions, it aids our interpretation of the

statute.

In a section entitled "When the Employer Could

Reasonably Believe that Known Disability Will Interfere With

Performance of Job Related Functions," the Guidance provides: 

When an employer could reasonably believe
that an applicant's known disability will
interfere with the performance of a job-
related function, the employer may ask that
particular applicant to describe or
demonstrate how s/he would perform the
function, with or without reasonable
accommodation. Such inquiries or requests
are not prohibited pre-offer inquiries.

 

3 Both parties refer us to this Guidance although it was
published after the decision by Cyro to reject Grenier's
application. We note that a revised version of the Guidance was
issued October 10, 1995, after oral argument in this case. See 
Equal Employment Opportunity Comm'n, Enforcement Guidance: Pre- 
Employment Disability-Related Questions and Medical Examinations 
(Oct. 10, 1995) (reprinted in EEOC Compl. Man. (CCH) 6093, at 
5371).

-13-

Example 5: R may ask an applicant with one 
leg who applies for a job as a telephone
linesperson to describe or demonstrate how
she would perform the duties of the job,
because R may reasonably believe that having
one leg interferes with the ability to climb
telephone poles.

In some cases, an applicant may not have an
obvious disability, but may voluntarily
disclose that s/he has a hidden disability
that would reasonably appear to interfere
with performance of a job-related function.
In such cases, the employer may ask the
applicant to describe or demonstrate
performance, with or without reasonable
accommodation. Such inquiries or requests
are not prohibited pre-offer inquiries.

Example 6: An applicant for the job of 
repairing underground sewer lines voluntarily
discloses that she has severe claustrophobia.
R may reasonably determine that severe
claustrophobia would interfere with an
employee's ability to work within the
confined space of an underground sewer. R
may therefore ask the applicant to describe
or demonstrate how she would perform the job,
with or without reasonable accommodation.

Guidance IV.B.5.b. 

The EEOC explains that allowing an employer to ask an

applicant with a known disability to describe or demonstrate how

he would perform a job-related function "is in the interest of

both applicants and employers." Id. at n.23. 

Employers are entitled to know whether an
applicant with an apparently interfering
disability can perform job-related functions,
with or without reasonable accommodation. It
is in the interest of an applicant with such
a disability to describe or demonstrate
performance in order to dispel notions that
s/he is unable to perform the job because of
the disability.

Id. 

-14-

In a section entitled "Inquiries Concerning Need for

Accommodation and Requests for Documentation if Applicant Asks

for Accommodation," the Guidance permits an employer during the

hiring process to require an applicant "to inform the employer of

any reasonable accommodation needed" to take an "interview" or

perform a "job demonstration." Id. IV.B.6.a. With respect to 

accommodations for the job, as opposed to accommodations for the

hiring process, the Guidance explains:

An employer may ask an applicant whether s/he
can perform specified job-related functions
with or without reasonable accommodation,
because these inquiries elicit information
about an applicant's ability to perform job 
functions, not information about an
applicant's disability. An employer also may
ask an applicant to describe or demonstrate,
at the pre-offer stage, how s/he would
perform job-related functions, with or
without reasonable accommodation, because
these inquiries elicit information about an
applicant's ability, not information about an 
applicant's disability. . . .

However, at the pre-offer stage, an employer
may not generally inquire whether the
applicant needs reasonable accommodation for
the job. For example, an employer may not
make inquiries such as, "Would you need
reasonable accommodation in this job?" or
"Would you need reasonable accommodation to
perform this specific function?" Such
inquiries are likely to elicit information
about the existence of a disability because,
generally, only an individual with a
disability would require an accommodation.
Therefore, these inquiries are prohibited at
the pre-offer stage. 

If an applicant has voluntarily disclosed
that s/he would need a reasonable
accommodation to perform the job, the
employer still may not make inquiries at the
pre-offer stage about the type of required 
reasonable accommodation (except where the

-15-

applicant has requested reasonable
accommodation as part of a required pre-offer
job demonstration, as described above). 

Id. IV.B.6.a (emphasis in original). 

When an applicant requests reasonable accommodation, an

employer may request "documentation from an appropriate

professional (e.g., a doctor, rehabilitation counsellor, etc.),

stating that s/he has a disability." Id. IV.B.6.b. An 

employer may also require documentation as to an applicant's

functional limitations "for which reasonable accommodation is

requested (and which flow from the disability.)" Id. The EEOC 

reasoned that such requests are not prohibited pre-offer

inquiries because:

Requesting such documentation is consistent
with the ADA's legislative history. For
example, Congress specifically anticipated
that when an applicant requests reasonable
accommodation for the application process (or
when an employee requests reasonable
accommodation for the job), the employer 
should engage in an interactive process with 
the individual to determine an effective 
reasonable accommodation. 

Id. (emphasis added). As an example, the EEOC stated that an 

employer may at the pre-offer stage require an applicant to

obtain documentation from a professional stating she cannot lift

a certain amount and needs reasonable accommodation. Id.  

C. The Pre-Offer Inquiry C. The Pre-Offer Inquiry

With this statutory and regulatory framework in mind,

we turn to Grenier's claim that Cyro's requirement of a medical

certification violates ADA 12112(d).

1. Getting Along 1. Getting Along

-16-

First, Grenier argues that Cyro's letter requiring a

medical certification constituted an impermissible inquiry

because the request was not for information about how he would

perform the job-related functions. Rather than ask "whether he

possessed the requisite skills to perform the electrical and

electronic tasks called for in the job description," Grenier

complains, "Cyro assumed that his ability to perform job related

functions was called into question by his history of mental

illness." Grenier argues that Cyro already had knowledge that he

was able to do the essential job-related functions because he had

worked there for nine years and was "technically qualified."

Grenier incorrectly assumes that the essential

functions of the job of shift electrician require only technical

ability and experience as an electrician. "The term essential

functions means the fundamental job duties of the employment

position the individual with a disability holds or desires." 29

C.F.R. 1630.2(n)(1). Technical skills and experience are not

the only essential requirements of a job. See Pesterfield v. 

Tennessee Valley Auth., 941 F.2d 437, 441-42 (6th Cir. 1991) ("at 

least the ability to get along with supervisors and co-workers"

was essential function of job as tool room attendant); Mancini v. 

General Electric Co., 820 F. Supp. 141, 147 (D. Vt. 1993) 

("ability to follow the orders of superiors is an essential

function of any position"); Pickard v. Widnall, 1994 WL 851282, 

*9 (S.D. Ohio, Dec. 15, 1994) (No. C-3-94-40) ("mental and

emotional stability" was essential job function for military

-17-

position); Johnston v. Morrison, 849 F. Supp. 777, 778 (N.D. Ala. 

1994) (waitress who was unable to handle pressures of working on

crowded nights or memorizing frequent menu changes was unable to

perform essential functions of job); cf. Bento v. I.T.O. Corp. of 

Rhode Island, 599 F. Supp. 731, 742-43 (D.R.I. 1984) (although 

there is "no question that plaintiff . . . is qualified to do the

job, at least in the sense of knowing how to perform it," he is

not necessarily "otherwise qualified" within the meaning of the

Rehabilitation Act).

More specifically, an employer may reasonably believe

that an employee known to have a paranoia about the plant manager

is not able to perform his job. Cf. Voytek v. University of 

California, 1994 WL 478805, *15, 6 A.D.D. 1137, 1161 (N.D. Cal., 

Aug. 25, 1994) (No. C-9203465 EFL) (holding that employee was

legally denied re-employment after period of disability where he

"could not continue to perform all of the tasks assigned to him,"

due in part to "the ongoing conflict with his supervisor").

The ADA does not require an employer to wear blinders

to a known disability at the pre-offer stage, but permits an

"interactive process" beneficial to both the employer and

applicant. The EEOC regulations recognize this by providing that

an employer can ask an applicant with a known disability to

describe or demonstrate how "with or without reasonable

accommodation" the applicant will be able to do the job. 29

C.F.R. 1630.14(a). Here, Cyro knew that the applicant had just

recently been unable to perform his specific job at Cyro as a

-18-

result of a mental disability for which he was still receiving

benefits from Cyro and undergoing psychiatric treatment. Indeed,

Grenier himself had claimed he was totally disabled from

performing any work, not just his specific job at Cyro. Cf. 

August v. Offices Unlimited, Inc., 981 F.2d 576, 581-82 (1st Cir. 

1982) (man who had asserted on insurance forms that he was

"totally disabled" and had presented no contrary evidence could

not be found to be "qualified handicapped person" under

Massachusetts anti-discrimination statute, Mass. Gen. L. ch.

151B); Reigel v. Kaiser Found. Health Plan, 859 F. Supp. 963, 969 

(E.D.N.C. 1994) (woman who certified to her disability insurer

that she could not perform her job was estopped from asserting

that during the same time period she had been qualified to

perform for purposes of the ADA). We hold that this employer did

not violate the prohibition in 12112(d) by inquiring into

Grenier's ability to function effectively in the workplace and to

get along with his co-workers and supervisor, rather than just

his technical qualifications as an electrician.4

2. The Medical Certification  2. The Medical Certification 

 

4 We note that the inquiry made by Cyro would not necessarily be
permissible under different circumstances, such as where the
employer was less familiar with the nature or extent of the
applicant's disability, or with the effect of the disability on
job performance. As the EEOC recognized when preparing the
Guidance, "there are sometimes subtle distinctions between a
permissible and a prohibited pre-offer inquiry." Guidance  
IV.B.6.b. See generally Paul F. Mickey, Jr. & Maryelena Pardo, 
Dealing with Mental Disabilities Under the ADA, 9 Lab. Law. 531 
(1993); Janet L. Hamilton, New Protections for Persons with 
Mental Illness in the Workplace under the Americans with 
Disabilities Act of 1990, 40 Clev. St. L. Rev. 63, 92 (1992). 

-19-

Next Grenier argues that Cyro's pre-offer requirement

of a medical certification is an illegal pre-offer inquiry under

the ADA because the regulations "do not by their terms permit a

request to someone other than the applicant at the preoffer

stage."

As a preliminary matter, we address whether a request

for medical certification constitutes a "medical examination" or

whether it is instead an "inquiry." The ADA prohibits an

employer from conducting any pre-offer "medical examination" of a

job applicant. 12112(d)(2). This prohibition applies to

psychological examinations. See Guidance at n. 47 (citing H.R. 

Rep. No. 485 (Pt. 3), 101st Cong., 2d Sess. 46 (1990), reprinted 

in 1990 U.S.C.C.A.N. vol. 4, Legis. Hist., 445, 469). The EEOC 

defined "medical examination" as follows:

Medical examinations are procedures or tests
that seek information about the existence,
nature, or severity of an individual's
physical or mental impairment, or that seek
information regarding an individual's
physical or psychological health.

Guidance V.A. We conclude that a certification from a treating 

psychiatrist that does not necessitate new tests or procedures is

best analyzed as an "inquiry" rather than as a "medical

examination."

Also, contrary to Grenier's assertion, the EEOC

interprets the ADA to allow certain inquiries of third parties at

the pre-offer stage. With respect to "inquiries to third parties

regarding an applicant's medical condition," the Guidance

provides that "[a]t the pre-offer stage", an employer can "ask a

-20-

third party (e.g., a reference) anything that it could ask the 

applicant directly." Guidance IV.B.15. Further, the EEOC 

finds that requests for documentation from health care providers

to confirm the existence of a disability are permissible where,

as here, requests for reasonable accommodation are made in

connection with the hiring process or job. See Guidance  

IV.B.6.b. We conclude that an employer may request that an

applicant provide medical certification from doctors of ability

to perform so long as the inquiry does not otherwise run afoul of

12112(d)(2)(A).

The primary thrust of Grenier's appeal is that this

inquiry -- the requirement of medical certification of ability to

perform from a former disabled employee applying to return to

work with the same employer -- violates 12112(d)(2)(A) in that

it constitutes an inquiry of a "job applicant as to whether such

applicant is an individual with a disability or as to the nature

or severity of such disability."

The Eighth Circuit recently addressed a similar factual

situation in Brumley v. Pena, 62 F.3d 277 (8th Cir. 1995), a case 

decided under the Rehabilitation Act, and applicable

regulations.5 Brumley was a mentally disabled former employee
 

5 The ADA extended to the private sector the essential
substantive provisions of the Rehabilitation Act of 1973, 29
U.S.C. 791-794. See Chai R. Feldblum, Medical Examinations 
and Inquiries under the Americans with Disabilities Act: A View 
from the Inside, 64 Temple L. Rev. 521, 521-22 (1991). Congress 
intended that Rehabilitation Act precedent be considered by the
courts in interpreting the ADA. See 42 U.S.C. 12201(a); see 
also Ennis v. National Ass'n of Business & Educational Radio, 
Inc., 53 F.3d 55, 57 (4th Cir. 1995) ("To the extent possible, we 

-21-

of the Federal Aviation Administration ("FAA") who sought

priority consideration for restoration to federal employment

pursuant to 5 U.S.C. 8151, which predicated the level of

priority for re-employment on the extent of recovery from the

disability. He challenged the agency's demand for a pre-

employment examination by a psychiatrist to determine whether he

was fully or only partially recovered from his severe reactive

depression. Id. at 279. In questioning the application of the 

regulations, the court noted that "[t]he dilemma here is that

Brumley is not an outside job applicant seeking employment at the

FAA for the first time." Id. "Rather, he is a recipient of . . 

. disability payments who is seeking to exercise his re-

employment rights with the FAA pursuant to [5 U.S.C. 8151]."

Id. The court concluded that the employer "retains the right to 

require that [the former employee's] medical condition be

verified in order to determine his re-employment rights." Id. at 

279. 

As in Brumley, this Court faces the quandary of 

determining the appropriate parameters of a pre-offer inquiry of

a former employee who is the recipient of disability benefits and

now seeks re-employment. Cyro argues that an employer should not

be forced to have "amnesia" with respect to a former employee

where it is well aware of the nature and severity of that
 

adjudicate ADA claims in a manner consistent with decisions
interpreting the Rehabilitation Act."). Specifically, the ADA's
statutory provisions on medical examinations and inquiries were
drawn from Rehabilitation Act regulations. See 29 C.F.R.  
1614.203(e) (formerly 1614.706); 45 C.F.R. 84.14.

-22-

employee's disability because it had previously received medical

information that formed the basis for its determination of

eligibility for disability benefits. Rather, it urges, Grenier

should be treated as an existing employee returning from

disability leave, in which case the employer would be able to

demand medical certification of ability to return to work. See 

42 U.S.C. 12112(d)(4) (ADA provisions for medical examinations

of existing employees); Hogan v. Bangor and Aroostook R.R. Co., 

61 F.3d 1034, 1036 (1st Cir. 1995) (employee was entitled to

reinstatement after suffering collapsed lung as soon as medical

evidence indicated he was fit to return); Pesterfield, 941 F.2d 

at 438 (employee who was hospitalized for psychiatric treatment

was required to provide medical certification as to ability to

return to work); Derbis v. United States Shoe Corp., 1994 WL 

631155, *5, 6 A.D.D. 1071, 1075, 3 A.D. Cas. 1029, 1030, 65 Fair

Empl. Prac. Cas. (BNA) 1328 (D. Md., Sept. 7, 1994) (No. MJG-93-

130) (where plaintiff on disability leave presented a medical

report which indicated the employee could return to work but only

with some accommodation, employer could require sufficient

information to allow it to consider any possible reasonable

accommodation), aff'd in part and remanded for further 

proceedings, 67 F.3d 294 (4th Cir. 1995) (table). We agree that 

this case is similar to that of an employee returning from

disability leave. It appears that neither Congress nor the EEOC

took into account the case of a returning employee when

formulating the restrictions on pre-offer inquiries. Here, as in

-23-

the case of the returning employee, the employer must be able to

assess the extent of the applicant's recovery from inability to

perform. Further, if accommodations are necessary to enable job

performance, the employer, who is already familiar with the

disability, must learn of those accommodations in order to have

any realistic chance of assessing ability to perform.

Grenier contends that the ADA as interpreted in the

Guidance prohibits an employer's requirement that a physician

identify the type of reasonable accommodations required for an 

employee to return to work. The Guidance states: "If an

applicant has voluntarily disclosed that s/he would need a

reasonable accommodation to perform the job, the employer still

may not make inquiries at the pre-offer stage about the type of 

required reasonable accommodation." Guidance IV.B.6.a.  

We conclude that the ADA does not preclude an employer

from asking an applicant with a known disability who seeks a 

reasonable accommodation to specify the type of accommodation he

seeks. As the District Court pointed out, the Guidance prohibits

pre-offer inquiry into the type of accommodation because it is

"likely to elicit information about the nature and severity of a

disability." Guidance IV.B.6.a. The central purpose of the 

prohibition on pre-offer inquiries generally is to ensure that an

applicant's hidden disability remains hidden. See H.R. Rep. 

No. 485 (Pt. 2), 101st Cong., 2d Sess., at 73, reprinted in 1990 

U.S.C.C.A.N. vol. 4, Legis. Hist., 303, 355 ("The legislation

prohibits any identification of a disability by inquiry or

-24-

examination at the pre-offer stage."); Guidance IV.A ("This 

prohibition is to ensure that an applicant's possible hidden

disability (including prior history of a disability) is not

considered by the employer prior to the assessment of the

applicant's non-medical qualifications.").

With respect to known disabilities, however, the

emphasis is on encouraging the employer to "engage in an

interactive process with the individual to determine an effective

reasonable accommodation." Guidance IV.B.6.b (citing H.R. Rep. 

No. 485 (Pt. 2), supra, at 65-66, U.S.C.C.A.N. at 347-48). That 

is why the EEOC allows an employer to ask an applicant with known

claustrophobia to describe pre-offer how she would perform the

job, with or without reasonable accommodation. There could be no

meaningful interaction if this court would accept the strict

interpretation Grenier presses on us that an employer who knows

the precise nature of a disability that interferes with essential

job functions cannot, on being informed pre-offer that

accommodation will be necessary, follow up with the logical

question "what kind?"6
 

6 On October 10, 1995, subsequent to oral argument, the EEOC
issued a new Guidance. Although neither party has argued
that we ought to consider this newest guidance, we note that
the EEOC has revised its interpretation of the ADA and now
reaches the same conclusion. Under a section headed "The
Pre-Offer Stage," the EEOC now explains:

However, when an employer could reasonably believe that
an applicant will need reasonable accommodation to
perform the functions of the job, the employer may ask
that applicant certain limited questions. 
Specifically, the employer may ask whether s/he needs 
reasonable accommodation and what type of reasonable 

-25-

In sum, an employer does not violate 12112(d)(2) of

the ADA by requiring a former employee with a recent known

disability applying for re-employment to provide medical

certification as to ability to return to work with or without

reasonable accommodation, and as to the type of any reasonable

accommodation necessary, as long as it is relevant to the

assessment of ability to perform essential job functions.

D. Intentional Discrimination in Denial of Application D. Intentional Discrimination in Denial of Application

Finally, Grenier argues on appeal that there remain

genuine issues of material fact as to his argument that Cyro

intentionally discriminated against him in violation of 42 U.S.C.

12112(a), as opposed to 12112(d). Grenier argues that, even

if Cyro did not violate the specific restrictions on pre-offer

inquiries, there is a genuine dispute of material fact whether

Cyro illegally discriminated against Grenier based upon his

disability when it denied his application for employment. 

By failing to make this argument in his opposition to

summary judgment, Grenier has failed to preserve this claim. "It

is by now axiomatic that an issue not presented to the trial

court cannot be raised for the first time on appeal." Johnston 

v. Holiday Inns, Inc., 595 F.2d 890, 894 (1st Cir. 1979). This 

 

accommodation would be needed to perform the functions 
of the job.

Enforcement Guidance: Pre-Employment Disability-Related 
Questions and Medical Examinations (Oct. 10, 1995) (emphasis 
in original).

-26-

rule may be relaxed only "in horrendous cases where a gross

miscarriage of justice would occur." Id. (quoting Newark 

Morning Ledger Co. v. United States, 539 F.2d 929, 932 (3d Cir. 

1976)). For a new argument to be considered, it must be "so

compelling as virtually to insure appellant's success." Id. 

(quoting Dobb v. Baker, 505 F.2d 1041, 1044 (1st Cir. 1974)). 

Even an issue raised in the complaint but ignored at

summary judgment may be deemed waived. "If a party fails to

assert a legal reason why summary judgment should not be granted,

that ground is waived and cannot be considered or raised on

appeal." Vaughner v. Pulito, 804 F.2d 873, 877 n.2 (5th Cir. 

1986); see also Liberles v. County of Cook, 709 F.2d 1122, 1126 

(7th Cir. 1983). This is because "an appellate court, in

reviewing a summary judgment order, can only consider those

matters presented to the district court." Frank C. Bailey 

Enterprises, Inc. v. Cargill, Inc., 582 F.2d 333, 334 (5th Cir. 

1978).

Although this alternative argument can be found in the

complaint, and Grenier asserts it would have been raised at

trial, this does not suffice to preserve the issue. Cyro moved

for summary judgment on all counts based solely on the validity

of the pre-offer inquiry under 12112(d). Grenier argued only

that issue in his brief. Although he made an oblique reference

in his memorandum opposing summary judgment to Cyro's failure to

challenge or admit his "ultimate contention that Andre was

discriminated against on the basis of his disability by the

-27-

rejection of his application," he concedes he never addressed the

alternative claim of intentional discrimination. The only

related evidence Grenier discussed in his "statement of material

facts" at summary judgment was that Lysaght stated on January 5,

1993 that Cyro was not seeking applicants, when it had in fact

given notice of the job opening the day before. See Ennis v. 

National Ass'n of Business & Educ. Radio, Inc., 53 F.3d 55, 58 

(4th Cir. 1995) (discussing prima facie elements of claim under 

12112(a)). After the judge entered final judgment once he had

determined that Cyro was entitled to summary judgment on the

issue of preemployment medical inquiries, no motion for

reconsideration was filed. There is nothing in the record which

persuades us to exercise our discretion to bend the raise-or-

waive rule.

III. CONCLUSION III. CONCLUSION

For the foregoing reasons, the District Court's grant

of summary judgment is AFFIRMED. AFFIRMED

-28-